Argued and submitted May 18, 1988, reversed and remanded September 13,
reconsideration denied November 9, petition for review denied November 30, 1989
(308 Or 593)

McINTYRE,
*Appellant,*

*v.*

CROUCH,
*Respondent.*

(2109-F; CA A44574)

780 P2d 239

Ronald A. Fontana, Portland, argued the cause for appellant; with him on the briefs was Steenson, Fontana, Schumann & Ellis, Portland.

G. Philip Arnold, Ashland, argued the cause for respondent; with him on the brief was Drescher & Arnold, Ashland.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

NEWMAN, J.

Deits, J., specially concurring.

Richardson, P. J., dissenting.

**NEWMAN, J.**

In this filiation action, ORS 109.124 *et seq,* petitioner appeals a summary judgment that declared that he has no parental rights as to the child that respondent, an unmarried woman, conceived by artificial insemination with petitioner's semen. Respondent contested petitioner's action to be declared the child's father. The parties filed cross-motions for summary judgment. Petitioner assigns as errors that the court granted respondent's motion and denied his motion. The court held that there was no genuine issue of material fact, that ORS 109.239 bars petitioner from obtaining parental rights and that, as applied to him, it is constitutional. We reverse.

To qualify under the filiation statute as an initiating party and be declared a father, *see* ORS 109.125(e) and ORS 109.155, petitioner must show that ORS 109.239 does not bar him. It is undisputed that, with respondent's knowledge, petitioner voluntarily gave his semen to her and that she inseminated herself without the supervision of a physician. The child was conceived as a result of the insemination. Petitioner and respondent were acquainted, but were not married to each other or to anyone else. Petitioner pleaded, and respondent denied in her answer, that he gave his semen to her in reliance on an agreement with her that he "would remain active" in the child's life and "participate in all important decisions concerning the child" and that he would have visitation rights one weekend each month and for six consecutive weeks each summer. Petitioner also pleaded, and respondent also denied in her answer, that he is ready, willing and able to accept the same responsibility for the support, education, maintenance and care of the child and for pregnancy related expenses as he would have if the child were born in lawful wedlock.

Five days before the hearing on the motions for summary judgment, petitioner served affidavits. They described the agreement and asserted that petitioner and respondent made it before he donated his semen, that he gave his semen in reliance on it and that he is ready, willing and able to undertake the responsibilities for the support, education, maintenance and care of the child as if it were born to him in marriage or as a result of sexual intercourse between him and respondent. Respondent did not file counteraffidavits. At the hearing, the court orally allowed respondent's motion and denied petitioner's.

On April 22, petitioner moved for reconsideration. In support of his motion, his counsel submitted an affidavit:

"I appeared before the Court on April 13, 1987, at 1:30 P.M., the hour set for hearing on the cross-Motions for Summary Judgment. The [court] announced that [it] had not received petitioner's response to the respondent's Motion for Summary Judgment, the Affidavits filed in support of petitioner's response, or petitioner's Memorandum of law. I advised the Court that the said documents had been placed in the United States mail at Portland, Oregon on April 8, 1987. Respondent's counsel * * * stated that his copies of the documents had been received at his office and he reviewed them the morning of April 13, 1987. At the time of the hearing, I provided the Court additional copies of petitioner's Response, Affidavits and Memorandum. * * *

"Respondent's counsel stated that there was an issue of fact in that his clients would dispute that there was an agreement between petitioner and respondent as was alleged in the Petition for Filiation and in the Affidavits filed by petitioner. I stated that if respondent disputed the facts alleged by petitioner, then petitioner demanded a jury trial to determine the facts."

On May 18, the court heard arguments on the motion to reconsider. The court entered a judgment on May 27 and an amended judgment on June 8 that each granted respondent's motion for summary judgment and denied petitioner's. Each judgment recited that the court had considered the "affidavits filed in support of the motions." Petitioner appeals from the amended judgment.

The statute respecting artificial insemination, Oregon Laws 1977, chapter 686 (the act), is codified at ORS 109.239 to ORS 109.247, ORS 677.355 to ORS 677.370 and ORS 677.990(1) and (3).[1] ORS 109.239 (section 5 of the act)

---

[1] Or Laws 1977, ch 686, provides:

"SECTION 1. As used in this Act, 'artificial insemination' means introduction of semen into a woman's vagina, cervical canal or uterus through the use of instruments or other artificial means.

"SECTION 2. Only physicians licensed under chapter 677 and persons under their supervision may select artificial insemination donors and perform artificial insemination.

"SECTION 3. (1) Artificial insemination shall not be performed upon a woman without her prior written request and consent and, if she is married, the

provides:

"If the donor of semen used in artificial insemination is not the mother's husband:

"(1) Such donor shall have no right, obligation or interest with respect to a child born as a result of the artificial insemination; and

"(2) A child born as a result of the artificial insemination shall have no right, obligation or interest with respect to the donor."

Petitioner argues that the legislature did not intend that ORS

prior written request and consent of her husband.

"(2) Whenever a child is born who may have been conceived by the use of semen of a donor who is not the woman's husband, a copy of the request and consent required under subsection (1) of this section shall be filed by the physician who performs the artificial insemination with the State Registrar of Vital Statistics. The state registrar shall prescribe the form of reporting.

"(3) The information filed under subsection (2) of this section shall be sealed by the state registrar and may be opened only upon an order of a court of competent jurisdiction.

"(4) If the physician who performs the artificial insemination does not deliver the child conceived as a result of the use of semen of a donor who is not the woman's husband, it is the duty of the woman and the husband who consented pursuant to subsection (1) of this section to give that physician notice of the child's birth. The physician who performs the artificial insemination shall be relieved of all liability for noncompliance with subsection (2) of this section if the noncompliance results from lack of notice of the physician about the birth.

"SECTION 4. No semen shall be donated for use in artificial insemination by any person who:

"(1) Has any disease or defect known by him to be transmissible by genes; or

"(2) Knows or has reason to know he has a venereal disease.

"SECTION 5. If the donor of semen used in artificial insemination is not the mother's husband:

"(1) Such donor shall have no right, obligation or interest with respect to a child born as a result of the artificial insemination; and

"(2) A child born as a result of the artificial insemination shall have no right, obligation or interest with respect to such donor.

"SECTION 6. The relationship, rights and obligations between a child born as a result of artificial insemination and the mother's husband shall be the same to all legal intents and purposes as if the child had been naturally and legitimately conceived by the mother and the mother's husband if the husband consented to the performance of artificial insemination.

"SECTION 7. Except as may be otherwise provided by a judicial decree entered in any action filed before the effective date of this Act, the provisions of this Act shall apply to all persons conceived as a result of artificial insemination.

"SECTION 8. A person who violates the provisions of sections 2 to 4 of this Act commits a Class C misdemeanor."

109.239 apply to bar him, because (1) the artificial insemination occurred without the intercession of a physician, (2) he is not an anonymous donor, (3) respondent is unmarried, (4) he gave respondent his semen in reliance on an agreement that they made that he would have parental rights and (5) he wishes to undertake the responsibilities of fatherhood. He also argues that if, as applied to him, ORS 109.239 deprives him of parental rights, it violates Article I, sections 10 and 20, of the Oregon Constitution, the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the federal constitutional right of privacy.

Respondent responds that she did not make the agreement with him but that, in any event, it is immaterial whether she did because, even if she made the agreement, he has no parental rights under the act. She also asserts that the act, as applied to petitioner, is constitutional.

■     We hold that ORS 109.239 applies to petitioner. Although the act does not define "donor," it is clear that a donor is a man who gives his semen for the purpose of artificial insemination. Petitioner is a donor, even though a physician or a person under his supervision did not perform the insemination, respondent knew that petitioner was the source of the semen when she used it and she was unmarried. Although ORS 677.360 (section 2 of the act) states that "[o]nly licensed physicians and persons under their supervision may select artificial insemination donors and perform artificial insemination," ORS 677.355 (section 1 of the act) defines "artificial insemination" without reference to whether a physician performs the insemination. Moreover, ORS 677.990(3) (section 8 of the act) only means that, if a woman artificially inseminates herself without a physician's supervision, she commits a class C misdemeanor. Furthermore, a man who gives his semen for the purpose of artificial insemination is a donor, even though the woman who uses it is unmarried. *See* ORS 677.365(1) (section 3(1) of the act).

We cannot say that the legislature intended that a man who gives his semen for the purpose of artificial insemination is not a donor simply because he is not anonymous—that is, he is known to the woman as the semen producer. The legitimate purposes of the act are: (1) to allow married couples to have children, even though the husband is

infertile, impotent or ill; (2) to allow an unmarried woman to conceive and bear a child without sexual intercourse; (3) to resolve potential disputes about parental rights and responsibilities: that is, (a) the mother's husband, if he consents, is father of the child and (b) an unmarried mother is freed of any claims by the donor of parental rights; (4) to encourage men to donate semen by protecting them against any claims by the mother or the child; and (5) to legitimate the child and give it rights against the mother's husband, if he consents to the insemination. To achieve those purposes, the act bars a donor from the rights and responsibilities of fatherhood. It would be inconsistent with the purposes of the act if a donor were *not* barred simply because he was known to the mother at the time of conception as the semen producer. Additionally, the act, by its terms, does not limit the application of ORS 109.239 to anonymous donors.

■      Furthermore, ORS 109.239 bars petitioner from rights and responsibilities of fatherhood, even if respondent had agreed with him before he gave her his semen that he would have these rights and responsibilities and he gave his semen in reliance on that agreement. Again, ORS 109.239 contains no qualifying language.[2] It is unambiguous. By its terms, it bars petitioner. We cannot rewrite the act.

■      Petitioner asserts, however, that ORS 109.230 makes the agreement enforceable:

> "Any contract between the mother and father of a child born out of wedlock is a legal contract, and the admission by the father of his fatherhood of the child is sufficient consideration to support the contract."

The legislature, however, enacted ORS 109.230 before it enacted the act. Petitioner, as a donor under ORS 109.239, is not a "father" under ORS 109.230.

■      Accordingly, we must determine if ORS 109.239, as applied to petitioner, is constitutional. If it is, any dispute over

---

[2] Compare RCW 26.26.050(2):

"The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived unless the donor and the woman agree in writing that said donor shall be the father. The agreement must be in writing and signed by the donor and the woman."

the existence or nature of the agreement would not be material. We turn first to the state constitutional issues. *State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983). Respondent asserts that ORS 109.239, as applied to him, violates Article I, section 20, of the Oregon Constitution.[3] It is not disputed that, if petitioner and respondent had mutually agreed that he should have the rights and responsibilities of fatherhood and, in reliance thereon, he gave her his semen by sexual intercourse, the legislature could not declare that he has no claim to be the father. Whether a male impregnates a woman by artificial insemination or by sexual intercourse, however, is not a distinction based on an immutable characteristic. A classification between males that bars some and not others from claiming to be a father, depending on how the male's semen is placed in an unmarried woman, will not violate Article I, section 20, if the classification has a rational foundation in the light of the statute's purpose. *See Van Daam v. Hegstrom,* 88 Or App 40, 43, 744 P2d 269 (1987). Even if petitioner and respondent agreed that he have the rights and responsibilities of fatherhood and, in reliance thereon, he had donated his semen, there is a rational connection between ORS 109.239, if applied to bar his fatherhood, and the purposes of the act.

■ Petitioner also argues that ORS 109.239 violates Article I, section 20, because it gives respondent, an unmarried female, parental rights that it denies to petitioner, an unmarried male. He emphasizes that an unmarried male who donates semen does not have the rights of a father, but an unmarried woman who receives the sperm and conceives and bears the child is not deprived of the rights of a mother. A statute that gives a privilege to women while denying it to men is inherently suspect and subject to strict scrutiny, unless the classification (1) is based on specific biological differences between men and women and (2) is rationally related to the purposes of the statute. *See Hewitt v. SAIF,* 294 Or 33, 46, 653 P2d 970 (1982). Here, the classification of unmarried males and unmarried females is based on biological differences

---

[3] Article I, section 20, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

between men and women. Only a male could contribute the sperm to accomplish conception; only a female could conceive and bear the child. Furthermore, the classification is rationally related to the purposes of the act and facilitates the use of artificial insemination by an unmarried woman.

■ ORS 109.239, as applied to petitioner, also does not violate Article I, section 10. The statute does not deny to him a remedy for an injury to his person other than, as noted below, to deny to him due process. Article I, section 10, is not a guarantee of due process. *See Cole v. Dept. of Revenue,* 294 Or 188, 191, 655 P2d 171 (1982); *Maddox v. Clac. Co. Sch. Dist. No. 25,* 293 Or 27, 34 n 7, 643 P2d 1253 (1982); *see also Hilton v. MVD,* 93 Or App 388, 393, 762 P2d 1030 (1988), *aff'd on different grounds* 308 Or 150 (1989); Linde, "Without Due Process," 49 Or L Rev 125, 136-138 (1970).

■ We turn to petitioner's federal constitutional claims. We hold that ORS 109.239, as applied to petitioner, will violate the Due Process Clause of the Fourteenth Amendment *if* he can establish that he and respondent agreed that he should have the rights and responsibilities of fatherhood and in reliance thereon he donated his semen. In *Lehr v. Robertson,* 463 US 248, 103 S Ct 2985, 77 L Ed 2d 614 (1983), the court discussed the significance to the man's rights and responsibilities of fatherhood of the biological connection between the man and the child. There, the issue was whether the unmarried father, whose child was conceived by sexual intercourse, had to have notice and an opportunity to be heard before the child could be adopted by others. Under New York law, an unmarried father would not receive notice and an opportunity to be heard in the adoption proceeding, unless he had asserted the rights and responsibilities of a father in a manner that New York law prescribed. The court stated:

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, * * * his interest in personal contact with his child acquires substantial protection under the Due Process Clause. * * * But the mere existence of a biological link does not merit equivalent constitutional protection. * * *

"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he

grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interest lie." 463 US at 261.

In *Lehr*, the biological father had not complied with the New York statute, and the court held that he was not entitled to notice and hearing. *Lehr* indicates, however, that, under the Due Process Clause, a state may not place an absolute bar to a biological father's efforts to assert the rights and responsibilities of fatherhood. Here, petitioner has the biological connection with respondent's child, although it is the result of artificial insemination, not sexual intercourse. He has complied with the procedural requirements to bring this filiation action. If he can prove the facts that he asserts in his affidavits, he clearly has "grasped the opportunity" to "participate in the rearing of his child." *Lehr v. Robertson, supra,* 463 US at 261, 262; *see also Stanley v. Illinois*, 405 US 645, 92 S Ct 1208, 31 L Ed 2d 551 (1972);[4] *compare Michael H. v. Gerald D.*, 491 US ___, 109 S Ct 2333, 105 L Ed 2d 91 (1989). Yet ORS 109.239 places an absolute bar to his assertion of the rights and responsibilities of fatherhood.[5]

---

[4] In *Stanley,* the Supreme Court invalidated a statute that allowed the state to terminate, without a hearing, the biological father's custody of his illegitimate children upon the death of their mother. In holding that the statute violated the father's rights to due process under the Fourteenth Amendment, the Court stated:

"The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children comes to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements. * * *

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed essential, * * * basic civil rights of man, * * * and rights far more precious than property rights. * * * It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." 405 US at 651. (Citations omitted).

[5] As indicated above, ORS 109.239 bars a donor, even though the unmarried woman knew that he was the donor when he gave her his semen. There is no constitutional requirement that, because the donor is known to the unmarried woman when he gives his semen, he must have a claim to be a father. That he is known does not mean that he has asserted any rights or assumed any responsibilities of fatherhood other than the donation itself. Simply by donating semen and making his identity known to the unmarried woman, he does not, in the language of *Lehr* "grasp the opportunity to accept some measure of responsibility for the child's future."

The Due Process Clause can afford no different protection to petitioner as the biological father because the child was conceived by artificial insemination rather than by sexual intercourse, providing that he can prove the facts that he asserts in his affidavits. The constitutionality of ORS 109.239, as applied to petitioner, turns on whether he can establish those facts. There are, therefore, genuine issues of material facts respecting the existence and nature of the agreement. The court erred when it granted summary judgment to respondent.[6]

■ The court did not err, however, when it denied summary judgment to petitioner. Although petitioner's affidavits describe the agreement and respondent did not file counter-affidavits, she did not have an adequate opportunity to respond before the court hearing on April 13, 1987. *See* ORCP 47C. When the court reconsidered the motions on May 18, petitioner's attorney had timely filed an affidavit that stated that respondent disputed that there was an agreement as alleged in the petition and in petitioner's affidavits.

Reversed and remanded.

**DEITS, J.,** specially concurring.

I agree with the lead opinion's conclusion that ORS 109.239, if it applies to this case, violates father's right to due process. However, I do not believe that we should even reach that issue, because the father in this case is not a "donor" for the purposes of ORS 109.239.

Judge Newman concludes that the term "donor," as used in ORS 109.239, is unambiguous and clearly applies to petitioner. I disagree. The term is not defined in the statute. When read in the context of the statutory scheme and its purpose, it becomes clear that the statute was not intended to apply to this unique fact situation. ORS 109.239 was adopted as part of Oregon Laws 1977, chapter 686, an act concerned exclusively with artificial insemination. The act established certain procedures for artificial insemination and required that only a licensed physician could perform the insemination.

---

[6] Because of our disposition of the case, we do not consider petitioner's claim that ORS 109.239 denies him equal protection of the laws or a right of privacy under the United States Constitution.

It also provided that only a physician or a person under his supervision could select the donor, that the woman must request and consent to the insemination and that copies of the consent must be filed with the Bureau of Vital Statistics.

The legislative history of the act clearly reveals that the legislature did not intend to address the circumstances presented in this case. Rather, the act was designed: (1) to establish a legal obligation for a husband to support a child born to his wife by means of an artificial insemination to which he has consented and (2) to relieve the sperm donor and the child of any rights or obligations toward one another when neither the donor nor the mother intended that the donor be the legal father.[1]

Father's situation here falls somewhere between the situation contemplated by the statute when a mother is inseminated with sperm obtained through a sperm bank from an anonymous donor, which clearly is governed by ORS 109.239, and the situation when a mother becomes pregnant through intercourse with a man who is not her husband, which clearly is not governed by ORS 109.239. In my view, the father in this case is much more closely aligned with the latter. Although there are significant differences between the situation here and one involving an anonymous donor, the only difference between this case and one involving an "ordinary," out-of-wedlock pregnancy is that mother and father here did not engage in intercourse. In my view, that should not be the test of fatherhood, and I do not believe the statute compels us to conclude that it is.

I would not construe the term "donor" to apply to father in this case. In my view, a donor, be it of property or of biological matter, is one who makes an unconditional,

---

[1] Although I agree in general with the lead opinion's summary of the purposes of the artificial insemination statute, I do not agree with its broad application of the third purpose "to resolve potential disputes about parental rights and responsibilities." 98 Or App 462 at 468. Although disputes over parental rights and responsibilities may be particularly cumbersome when an anonymous donor is involved, the same problems do not arise in a case such as this, where there is no question as to the identity of the donor or, for purposes of summary judgment at least, the parties' intent. Ironically, the only cumbersome dispute in this case arises out of the statute itself. Were it not for the statute, there would be no question but that father has rights in and responsibilities for his biological child. I fail to see how a broad application of the statute to this case furthers any of the purposes that it cites.

no-strings-attached "donation."[2] How can it be said that one "donates" a thing when he reserves the right to visit its product one weekend each month, six weeks each summer, every other birthday, alternate holidays and every Father's Day? How is one a "donor" when he agrees to participate in the support, maintenance and upbringing of the product of the donated thing? If, on remand, father establishes that an agreement exists between mother and him, I would hold it enforceable under ORS 109.230.[3]

### RICHARDSON, P. J., dissenting.

I agree with the lead opinion that ORS 109.239 applies to petitioner by its terms and precludes him from obtaining parental rights in the child. I do not agree that that application of the statute is unconstitutional. I therefore respectfully dissent.

I have little to add to the lead opinion's able discussion of the applicability of the statute. I agree with the observation in the concurring opinion that the legislature "did not intend to address the circumstances presented in this case" 98 Or App at 473 if, by that, Judge Deits means that the legislature probably did not think of this situation when it considered and adopted ORS 109.239. However, I do not think that that matters. The language of the statute is reasonably clear, and its general objective of denying parental rights to males whose semen is used for artificial insemination is very clear. ORS 109.239 applies when "the donor of semen used in artificial insemination is not the mother's husband." Thus, even the husband of a recipient is a "donor" under the statute, and husbands of recipients are the only donors who are not subject to the statutory exclusion of rights and obligations.

The quoted language also shows that the legislature

---

[2] *See, e.g., Black's Law Dictionary* 437, 439 (5th ed 1979):

"Donatio. * * * The act by which the owner of a thing voluntarily transfers the title and possession of the same from himself to another person, without any consideration.

"Donor. * * * One who makes a gift."

[3] ORS 109.230 provides:

"Any contract between the mother and father of a child born out of wedlock is a legal contract, and the admission by the father of his fatherhood of the child is sufficient consideration to support the contract."

was aware that a male who is acquainted with a woman, as well as a stranger, can be the source of the semen that is used for artificial insemination. The only "known" males to whom it made the statutory exclusions inapplicable are husbands who donate semen to their wives. Whether that was done by design or oversight, it was done unambiguously. It may be that, if the legislature had thought of a situation like this, where a donor who is not the mother's husband has a consensual parental arrangement with her, it might have considered a second exception to the operation of the statute. However, it is not for this court to create that exception on the supposition that the legislature would or should have done so or that it did not mean what its statute clearly says.

I do not agree with the lead opinion and the concurrence that the application of ORS 109.239 to petitioner is a denial of due process. *Lehr v. Robertson,* 463 US 248, 103 S Ct 2985, 77 L Ed 2d 614 (1983), and *Stanley v. Illinois,* 405 US 645, 92 S Ct 1208, 31 L Ed 2d 551 (1972), on which the lead opinion and petitioner rely, involved the rights of unwed fathers with respect to children who were conceived through sexual intercourse. The lead opinion postulates that petitioner's constitutionally protected interest is of the same magnitude as that of the fathers in those cases. Even if I shared that assumption, I would not agree with the lead opinion's resolution of the due process issue. The state has a legitimate and compelling interest in the regulation of artificial insemination and its social and economic incidents. The state's interest in this subject and in this substantive regulation is far greater than the governmental interest in the procedure that was held unconstitutional in *Stanley* or the one that was upheld in *Lehr.*

The lead and concurring opinions seem to treat petitioner's situation as more analogous to that of a father who has impregnated a mother by sexual intercourse than to that of the typical artificial insemination donor. They emphasize the consensual decision to have a child that likens petitioner to an ordinary father and the "anonymous" nature of the typical donor that differentiates petitioner. My colleagues appear oblivious of the fact that the lines they draw are easily crossed. I cannot discern why the lead opinion's due process reasoning would not extend to an anonymous donor who has second thoughts, obtains the mother's identity and institutes

a filiation proceeding or why that donor would any the less than petitioner be engaged in "efforts to assert the rights and responsibilities of fatherhood." 98 Or App at 471.

The lead opinion also seeks to differentiate petitioner from other donors who might be familiar with the mother of an artificially inseminated child. It states:

"There is no constitutional requirement that, because the donor is known to the unmarried woman when he gives his semen, he must have a claim to be a father. That he is known does not mean that he has asserted any rights or assumed any responsibilities of fatherhood other than the donation itself. Simply by donating semen and making his identity known to the unmarried woman, he does not, in the language of *Lehr* 'grasp the opportunity to accept some measure of responsibility for the child's future.' " 98 Or App at 471, n 5.

The lead opinion attempts to put petitioner in a one-man compartment and does not recognize that he cannot be forced into the compartment without bursting it. The relevant language in *Lehr v. Robertson, supra,* does not turn on the mother's awareness of the father's identity, but on the father's *subsequent* attempt to assert and accept parenthood. There is no difference, for purposes of due process analysis, between petitioner and the other artificial insemination donors whom the lead opinion seeks to distinguish, except that petitioner is the only donor of semen who has sought to be recognized as a father *so far*.

The foregoing discussion is not designed to demonstrate that other donors enjoy the due process entitlement that my colleagues would confer on petitioner, but to help explain why petitioner has no such entitlement. Unlike the procedures considered in *Stanley v. Illinois, supra,* and *Lehr v. Robertson, supra,* ORS 109.239 is a substantive regulation in which the governmental interest is great. Its effect is not limited to parental rights and obligations. As the lead opinion points out, the resolution of "potential disputes about parental rights and responsibilities," 98 Or App at 468, is integral to the legislative scheme of regulating artificial insemination. The statutes contemplate that the ultimate relationship, or absence of one, must be defined before the child is conceived in order to facilitate informed decisions about whether to

donate and to conceive. The statutory policy assures the stability of all the parties' lives in the aftermath of the decisions. The holding of the lead opinion turns the statutory scheme into a house of sand.

I would reject petitioner's due process argument. I agree with the lead opinion that his other constitutional arguments fail, and I would affirm the judgment.

I dissent.