Edward STRAUB, Appellant
(Respondent Below),

v.

B.M.T., By next friend, Francine TODD,
Appellee (Petitioner Below).

No. 10A04–9302–JV–53.

Court of Appeals of Indiana,
Fourth District.

Dec. 30, 1993.

Rehearing Denied Feb. 11, 1994.

S. Frank Mattox, Mattox & Mattox, New Albany, for appellant.

Earl C. Mullins, Jr., Evans, Bishop, Masters, & Mullins, Clarksville, for appellee.

MILLER, Judge.

On December 15, 1986, Edward Straub, 58, agreed to have intercourse with Francine Todd, 33, so long as she signed an agreement that would hold Straub harmless for emotional and financial support of a child which might result from their sexual relationship. After Todd signed a handwritten note that Straub felt satisfied his conditions, the couple began engaging in unprotected sexual intercourse which resulted in the birth of B.M.T. on November 27, 1987.

After three years of raising B.M.T. without any support from Straub, on January 7, 1991, Todd filed suit as B.M.T.'s best friend to establish paternity and obtain child support and medical expenses.[1] In spite of the agreement, the court ordered Straub to pay the sum of $130.00 per week child support and awarded Todd $1005.00 in medical costs relating to the birth of the child. Straub now claims that: 1) the trial court committed reversible error by holding that the agreement was void as a matter of public policy; and 2) that the agreement should serve to indemnify him against the support claim brought by Todd.[2]

We affirm.

## FACTS

Straub and Todd began dating in 1985 when both were teachers at the same elementary school. In late 1986, Todd discussed her desire to have a child with Straub after her doctor informed her that artificial insemination would not work. Straub told Todd that he did not want the responsibility of another family due to his age and the fact that he already had children from a previous marriage. However, when Todd threatened to end their relationship, he agreed to try to impregnate her providing she would sign a "hold harmless" agreement. On December 15, 1986, Straub presented Todd with a holographic agreement purporting to hold Straub harmless from financial and emotional support of a child which might result from the couple's

---

**1.** Ind.Code 31-6-6.1-2 provides in pertinent part:
(a) A paternity action may be filed by the following persons:
(1) The mother, or expectant mother.
(2) A man alleging that he is the child's biological father, or that he is the expectant father of an unborn child.
(3) The mother and a man alleging that he is her child's biological father, or by the expectant mother and a man alleging that he is the biological father of her unborn child, filing jointly.
(4) A child.
A person under the age of eighteen (18) may file a petition if he is competent except for his age. A person who is otherwise incompetent may file a petition through his guardian, guardian ad litem, or next friend.
\*  \*  \*  \*  \*  \*
(c) *In every case, the child,* the child's mother, and any person alleged to be the father *are* necessary parties to the action. (Emphasis added).
We also note that the statute of limitations, Ind.Code 31-6-6.1-6, provides different time periods for parents and children. Subsection (a) states that the mother (or father) has two years after the child is born to file an action. The child "may file a petition at any time before he reaches twenty (20) years of age. If the child is incompetent on his eighteenth birthday, he may file a petition within two years after he becomes competent." Subsection (b). In the instant case, Todd could not bring an action in her name because more than two years had passed from the date of B.M.T.'s birth.

**2.** Straub did not raise as error either the trial court's custody award of B.M.T. to Todd, or the lack of a visitation order for Straub. However, because the trial court has continuing jurisdiction over this case, Straub could raise these issues later.

sexual relations. Todd signed the agreement and nature took its course. Their relationship continued for three years after B.M.T.'s birth and only ended when Todd decided to bring suit to establish paternity, even though Straub had married someone else.

The trial court entered findings of fact and conclusions of law that found in pertinent part:

### Findings of Fact

8. Francine considered ending her relationship with Edward [Straub] and attempting to become pregnant through another man. Edward [Straub] did not want to end the relationship and agreed to attempt to impregnate Francine after she agreed to sign a document which he drafted in his own hand.

That document, Petitioner's Exhibit # 8, reads in its entirety as follows:

> "To Whom it may concern
>
> I Francine Todd in sound mind & fore thought have decided not to marry, but would like to have a baby of my own. To support financially & emotionally, I have approached several men who will not be held responsible financially or emotionally who's [sic] names will be kept secret for life.
>
> Signed *Francine Todd*
> Dec. 15, 1986"

9. Following the execution [of the agreement] Francine [Todd] and Edward [Straub] began to have unprotected sex and in March of 1987 Francine became pregnant. During this period Francine testified that she was not sexually active with any other man. Edward generally acknowledged such.

10. During Francine's pregnancy she and Edward were sexually active.

\* \* \* \* \* \*

12. Edward continued to have sexual relations with Francine after the child's birth but did not establish a relationship with the child. He stopped seeing Francine after she filed this action. . . .

### Conclusions of Law

3. The respondent, Edward Straub, is the natural biological father of B.M.T.

4. Edward has a common-law, statutory, moral, and societal obligation to support his minor daughter.

5. Francine cannot contract away the rights of the child, B.M.T.

6. The right of an illegitimate child to support and the right to have a trial court determine the best interest of that child cannot be contracted away.

7. The State of Indiana has a compelling interest in assuming that the primary obligation for support of illegitimate children falls on both natural parents and not on the taxpayers of the State.

8. The purported agreement between Francine and Edward as it pertains to the support of B.M.T. is void as a matter of public policy.

Supp.R. 2–5.

Straub then filed a motion to correct error in which he raised three issues claiming: (1) the court erred by failing to distinguish between the pre-conception and post-conception rights of minor children; (2) the parties' agreement is a valid and enforceable indemnification agreement; and (3) the court's finding of paternity was not supported by probative evidence. R. 3–6. The trial court denied his motion.

To this court, Straub now raises two issues: (1) whether the trial court committed reversible error in holding that the parties' voluntary agreement was void as against public policy; and (2) whether the parties' agreement is an enforceable indemnification agreement by and between Edward Straub and Francine Todd. Straub's Brief at 1.

### DECISION

### I. IS THE AGREEMENT AGAINST INDIANA'S PUBLIC POLICY?

Straub argues the trial court committed reversible error by finding the agreement void and unenforceable as a matter of public policy, i.e., as a matter of law. Here,

the facts are not in dispute and we are faced with a pure question of law. We will affirm findings and conclusions of the trial court unless they are clearly erroneous. *Williams v. City of Indianapolis Dept. of Public Works* (1990), Ind.App., 558 N.E.2d 884, *trans. denied;* Ind.Trial Rule 52(A).

██  Indiana has long recognized the obligation of both parents to support their children. *Elbert v. Elbert* (1991), Ind.App., 579 N.E.2d 102. In *Matter of M.D.H.* (1982), Ind.App., 437 N.E.2d 119, 126, the court noted that current statutory provisions relating to support orders for legitimate and illegitimate children are virtually identical.[3] The court stated, "[A] parent's obligation to support his minor child, legitimate or illegitimate, is a *basic tenet recognized in this state by statutes* that provide civil and criminal sanctions against parents who neglect such duty ..." *Id.* at 127 (emphasis added).[4] In addition, there is a well-established common-law duty and obligation of a *father* to assist in the support of his children. *Holderness v. Holderness* (1984), Ind.App., 471 N.E.2d 1157, 1160, *citing, Taylor v. Taylor* (1982), Ind., 436 N.E.2d 56; *Bill v. Bill* (1972), 155 Ind.App. 65, 290 N.E.2d 749; *Crowe v. Crowe* (1965), 247 Ind. 51, 211 N.E.2d 164; *McCormick v. Collard* (1937), 105 Ind.App. 92, 10 N.E.2d 742.

██  As this court has noted, the interests of children are not necessarily the same as those of their mother. *Kieler v. C.A.T. by Trammel* (1993), Ind.App., 616 N.E.2d 34, 38. Although securing support and education expenses for children is the primary purpose of a paternity action, the interests of the children are not limited to child support. *J.E. v. N.W.S., by S.L.S.* (1991), Ind.App., 582 N.E.2d 829, 831. *J.E.* involved a question of *res judicata* in a paternity action brought on behalf of the child. In finding that the child's interests were separate from the parents, Judge Rucker explained:

A child born out of wedlock who establishes paternity in a timely fashion has certain rights to inherit from the father, Ind.Code 29–1–2–7(b), as well as certain rights to claim other economic benefits upon the death of the father. *S.V. v. The Estate of James A. Bellamy* (1991), Ind.App., 579 N.E.2d 144. These rights, in addition to the right to receive child support, are of constitutional dimensions and are entitled to protection under the equal protection clause of the United States Constitution. *Mills v. Habluetzel* (1982), 456 U.S. 91 [102 S.Ct. 1549, 71 L.Ed.2d 770].

In light of the interests involved and *the manifest purpose of the statutory scheme to promote the welfare of the child* ... [in an action where a child may be barred from establishing its rights on *res judicata* ground] ... we hold [that] this result [the loss of the child's rights] can only be justified where the Child was clearly named as a party in the prior proceeding.

*Id.* at 831–832 (emphasis added).

In addition, the court noted in *Matter of S.L.* (1992), Ind.App., 599 N.E.2d 227, that the legislature also has recognized, in adoption and termination of parental rights proceedings, that the interests of the State and the interests of the child are not necessarily identical. *Id.* at 230 n. 3. Thus, the legislature "enacted several statutes which direct or permit the court to appoint a representative for the children involved in such proceedings. *See* Ind.Code 31–6–4–10(g) [1980], Ind.Code 31–6–4–13.6(c)(1) and (2) [1991], and Ind.Code 31–6–5–4(d) [1989]." *Id.*

██  It is apparent that our legislature has created a strong current public policy (and not merely maintained an ancient one) with the object of protecting the rights of children from the whims of their parents

---

**3.** Ind.Code 31–1–11.5–12 (Dissolution of Marriage); Ind.Code 31–6–6.1–13 (Paternity).

**4.** Ind.Code 35–46–1–5(a) provides:

A person who knowingly or intentionally fails to provide support to his dependent child commits nonsupport of a child, a Class D felony.

and the power of the state.[5] As noted by our supreme court, "[t]he making and changing of public policy, no matter how well intentioned, is primarily a legislative, not a judicial function." *Matter of Boles* (1990), Ind., 555 N.E.2d 1284, 1289. "The obligation of a judicial officer is to uphold and apply the laws, not to defy them, and not to enact them." *Id.*[6]

■ Straub first claims that "fundamental contract principles" allow him to contract around his statutory and common-law duty to provide support to his daughter. He ignores other rights, such as inheritance. *See J.E. v. N.W.S., by S.L.S., supra.* However, this argument fails because it amounts to the contracting away of his daughter's right to support. It is well settled that a parent cannot, by his own contract, relieve himself of the legal obligation to support his minor children. *Brokaw v. Brokaw* (1980), Ind.App., 398 N.E.2d 1385. In *Ort v. Schage* (1991), Ind. App., 580 N.E.2d 335, we held that an agreement to forego court ordered child support even in exchange for a benefit (social security payments) to the child is unenforceable because a parent has no right to contract away a child's support benefits. *Id.* at 336–337; *See also, Pickett v. Pickett* (1984), Ind.App., 470 N.E.2d 751, 754. Although both *Ort* and *Pickett* involved legitimate children in divorce actions, there is no distinction between legitimate and illegitimate children in regard to their right to child support.

■ Although the primary goal of a paternity action is to secure support and education for illegitimate children, "a legitimate subsidiary goal of this same action, however, is 'to protect the public interest by preventing the illegitimate child from becoming a ward of the state.'" *Matter of M.D.H., supra, citing, J.E.G. v. C.J.E.* (1977), Ind.App., 360 N.E.2d 1030. Public policy considerations mandate that the state take an active interest in providing for the welfare of illegitimate children in order to avoid placing an undue financial burden on its taxpayers.

"The duty of parents to provide necessary support, care, and maintenance for their children, although arising out of the fact of their relationship, may be rested upon the interest of the state as *parens patriae* of children and of the community at large in preventing them from becoming a public burden, and is, therefore, a duty not only to themselves, but to the public as well. This duty is at the same time a legal and natural obligation, *the consistent enforcement of which is equally essential to the well-being of the state, the morals of the community, and the development of the individual."* 59 Am.Jur.2d *Parent and Child* § 51 (emphasis added).

■ Straub contends that the doctrines of laches and equitable estoppel also preclude Todd's claim for support. However, as stated in *Pickett, supra,* an estoppel defense will not bar a party from asserting a claim for child support.

"Even if it could be said that (a party) should be estopped from denying the existence of an agreement, such an agreement is unenforceable. It has been held that *the parent having custody* in such a proceeding as this *is merely a trustee* of the support payments, *and therefore, would have no right to contract away the benefits of the trust."* *Pickett, citing, Reffeitt v. Reffeitt* (1981), Ind.App., 419 N.E.2d 999, 1003, *quoting, Grace v. Quigg* (1971), 150 Ind.App. 371, 276 N.E.2d 594, 599. (emphasis in original).

Thus, a private agreement, such as the one before us, relieving a parent of either gender of the duty to provide child support is unenforceable, and consequently, an estoppel defense would not preclude an award of child support. Regarding his laches argument, we note Ind.Code 31–6–6.1–6 allows a

---

5. Additionally, this policy is *gender-neutral* and should apply whenever two people have sexual intercourse with a view toward either parent having sole custody of the resulting child to the physical and financial exclusion of the other.

6. It is, therefore, not the place of this court to abandon that long-standing policy in this situation by acting as a barometer of public opinion, as Judge Conover's dissent would urge us to do.

child to bring such an action "at any time before he reaches twenty (20) years of age." Todd, as the child's guardian and trustee for the child's support, brought this action on behalf of B.M.T. in a timely manner.

■ Finally, Straub argues that the agreement signed by Todd should be enforced because he was acting merely as a "sperm donor." He argues that we should follow cases from other jurisdictions which look to the pre-conception intent of the parties involved in deciding whether to enforce their agreement. Straub's Brief at 25–27 citing *Davis v. Davis* (1993), Tenn., 842 S.W.2d 588, *cert. denied sub nom.* (1993), —— U.S. ——, 113 S.Ct. 1259, 122 L.Ed.2d 657; *In re Interest of R.C.* (1989), Colo., 775 P.2d 27; *McIntyre v. Crouch* (1989), 98 Or.App. 462, 780 P.2d 239, *review denied, cert. denied* (1990), 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288.[7] We are not persuaded.

■ We first note, of course, arguing that Straub's and Todd's relationship was that of a sperm donor and donee ignores the facts. It is undisputed that Straub and Todd had an ongoing affair, one which began before Todd decided to become pregnant and only ended three years after B.M.T.'s birth when she decided to have a second child by Straub—after Straub had married someone else. Secondly, both parties testified, and the trial court found, that Straub and Todd continued to have intercourse after Todd became pregnant with B.M.T. and their relationship continued for a number of years after B.M.T.'s birth.

We know of no medical requirements—or of any sperm donor program—that continues to give insemination injections after the donee becomes pregnant.

Finally, in this action we are not concerned with any alleged contractual rights of the parents—paternity actions in Indiana are only concerned with establishing paternity and with the rights of the child. Indiana's public policy, as created by our legislature, is clear. The trial court did not err in finding Straub's and Todd's agreement was void because it is against Indiana's public policy.

## II. INDEMNIFICATION

Straub argues that he should be indemnified against any support claims because: 1) Todd is capable of supporting the child on her own; and 2) the "economic injury" to Straub due to her "breach of contract" would exceed $100,000.00. Because this argument merely seeks to circumvent public policy, it too must fail. First, because the agreement between the parties is void, there is no enforceable contract to breach. Second, Todd's *present* ability to care for the child on her own and the cost of the support to Straub do not change the law—Straub must provide his share of his daughter's support as determined by the trial court under the Guidelines, which take into account *both* parent's incomes.[8] Third, the agreement itself is clearly not an indemnification agreement—it is barely coherent. Finally, Todd kept her part of the bargain—she did not bring an action in her name in a timely manner to establish pater-

7. If we were to accept Straub's argument, this type of contract would arguably be binding in a variety of situations. For example, a couple desirous of having a child, but for some reason—religious or otherwise—feels the child should be born in wedlock, could enter into a valid and binding antenuptial agreement absolving one of the parents from the duty to support the child after divorce. Similarly, an agreement made after marriage (and in contemplation of divorce) would also be binding.

8. We must be ever mindful of the best interests of this child. Thus, B.M.T. has a right to more than the basic necessities of life. Specifically, she has a right to the lifestyle that her parent's combined income will furnish. This right may

not be contracted away by her parents, and to do so is a violation of public policy. However, while we are not able to address every factual possibility, we recognize an exception may lie where the custodial parent is so affluent as to render the contribution of the non-custodial parent's income irrelevant to the child's lifestyle. In that case, the child's lifestyle may not be an issue, and it might be argued that the parents would not be contracting away the best interests of the child. Here, however, because Todd's only apparent income is her salary for teaching school, this appears to be a typical case wherein the child is entitled to the lifestyle that the combination of her parent's incomes will afford.

nity—the action before us is in the name of B.M.T.

The judgment of the trial court is affirmed.

CHEZEM, J., concurring in result with separate opinion.

CONOVER, J., dissenting with separate opinion.

CHEZEM, Judge, concurring in result.

I concur in the result reached in Judge Miller's opinion. In this state there exists no statutory protection[9] against a paternity action for a man who donates his sperm for purposes of insemination, whether the donation be made through a sperm bank, physician, or directly to the ultimate recipient. The trial court correctly established paternity.

I believe, however, that the contract should be treated as an assumption by Todd of Straub's obligation of support. Todd agreed to hold Straub harmless for his support obligation to B.M.T. Straub's support obligation to B.M.T. cannot be enforced against him unless Todd herself is without the means to pay that obligation.

The trial court retains jurisdiction for a determination of Todd's ability to provide support based on the Indiana Child Support Guidelines, and for determinations of custody and visitation.

CONOVER, Judge, dissenting.

I respectfully dissent for the reasons stated below.

The facts here are simple and without conflict. Todd, an unmarried adult female teacher, wanted to have a child but did not want to remarry to accomplish that end. When she was medically advised artificial insemination would not work in her case, she asked her current lover Straub, a 56 year old adult male teacher, to cease using condoms during intercourse and impregnate her. Straub already had raised 5 children of his own. While willing to help, Straub neither wanted to raise another child nor assume the financial obligations concomitant with child rearing. Straub told Todd he would accommodate her if he could be free of the obligation to support the child-to-be and his name as inseminator would remain a secret. Agreeing, Todd, an employed teacher fully capable of supporting the child, signed a written agreement to that effect that Straub had prepared. In the normal course of things thereafter, Todd became pregnant.

Three years after the child was born, Todd changed her mind, filed a paternity action against Straub, and was successful. The trial court ordered him, as father, to pay support per our rules for determining child support.

Straub appeals and the majority affirms on public policy grounds. It declares contracts which relieve parents of the obligation to support their offspring are void as against public policy. However, I am convinced our conventional public policy statements regarding the support and nurture of children born out of wedlock are subject to a narrowly-drawn exception under the facts with which we are here confronted.

Today, the general public almost universally looks with understanding and approval upon a single woman's desire to bear and nurture a child without male interference. A financially responsible modern woman, at her option, has an unqualified right to do so, it perceives. In other words, our declarations on this subject are currently incorrect. They reflect policy which has been dead since the 1960's. Accordingly, they must be changed, in my view, because we are subject to the public's will in such matters.

---

9. The Uniform Parentage Act was approved by the National Conference of Commissioners on Uniform State Laws in 1973. Section 5(b) of the Uniform Parentage Act provides "The donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." Eighteen states (Alabama, California, Colorado, Delaware, Hawaii, Illinois, Kansas, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Rhode Island, Washington, and Wyoming) have adopted the Act.

I find no better statement of the vagaries of public policy than this:

Public policy has been described as a will-o'-the-wisp of the law which varies and changes with the interests, habits, needs, sentiments, and fashions of the day; the public policy of one generation may not, under changed conditions, be the public policy of another. Thus, the very reverse of that which is public policy at one time may become public policy at another time. Hence, no fixed rules can be given by which to determine what is public policy for all time. When an alteration of public policy on any given point of general interest has actually taken place, and such alteration is indicated by long-continued change of conduct on the part of the people affected and has become practically universal, the court may recognize the fact and declare the public policy accordingly.

... What the public policy is must be determined from a consideration of the federal and state constitutions, the laws, the decisions of the courts, and the course of administration, not by the varying opinions of laymen, lawyers, or judges, as to the demands of the interests of the public.

17A Am.Jur.2d *Contracts*, § 258, Lawyers Cooperative Publishing Co. (1991). Accord, as to public policy determination methods, *Russell v. Johnson* (1943) 220 Ind. 649, 46 N.E.2d 219, 225–226.

I believe this change in public policy is readily discernible. Following *Russell's* guidelines, I simply turn to our highest governing document, the Indiana Constitution. To eliminate any questions concerning the equality of women in Indiana, our 1983 legislature enacted P.L. 383–1983, the so-called "Clean-up Amendment" to the Indiana Constitution. Among other things, it rendered certain passages therein gender neutral by striking "men" from the wording and replacing it with "people" or by striking "man" and substituting "person." Undoubtedly for our purposes here, the most significant of those changes appears in Article I, Section 1. It now reads, in part

ARTICLE I

SECTION 1. WE DECLARE, That all ~~men~~ *people* are created equal; that they are endowed by their CREATOR with certain *inalienable rights;* that among these are life, liberty, and *the pursuit of happiness;* ... (emphasis supplied)

Other sections of our constitution contain similar changes to accomplish gender neutrality. Thus, our constitution now mandates absolute equality for *all* people, not just men. These amendments removed the last vestiges of contractual disability due to womanhood, if any still existed in 1983. Thus, under Art. I, Sec. 1, an Indiana woman in this modern age has had an inalienable right to contract in any manner she chooses in the pursuit of her happiness, in this case the birth of a child she could raise and nurture without male interference, since 1983. While other changes in federal and state law abound which articulate current public policy in this area, the amendment of Art. I, Sec. 1 in my opinion, is the only demonstration of it we need to justify the restatement of public policy which I believe must be made.

However, with absolute equality comes absolute responsibility under our concepts of law. Since the last obstructions to contractual equality due to womanhood have been removed, women are now irrevocably bound to perform the obligations they incur when contracting just as men are. Courts have neither the right nor the power in the name of public policy to intervene simply because the contracting woman with the benefit of hindsight determines she has made a bad bargain by entering into a contract of this kind. The courts now must leave the parties where they find them in such cases.

Thus, in my opinion, the contract in question is valid and enforceable because it is conversant with current public policy. Todd had an absolute right to contract with Straub as she did, and is absolutely bound by the obligations she incurred under that contract. Quite simply, she bargained away the right to file a paternity action

against Straub and to publicly name him as the child's father. Exculpatory agreements which agree in advance that one is under no obligation of care for another and not liable for future actionable conduct have long been recognized. *Weaver v. American Oil Co.* (1972) 257 Ind. 458, 276 N.E.2d 144, 148; *LaFrenz v. Lake County Fair Board* (1977), 172 Ind.App. 389, 360 N.E.2d 605, 607; *Loper v. Standard Oil Co.* (1965) 138 Ind.App. 84, 211 N.E.2d 797, 800–801.

As the second reason for voiding the contract at issue here, the majority says

Although the primary goal of a paternity action is to secure support and education for illegitimate children, "a legitimate subsidiary goal of this same action, however, is 'to protect the public interest by preventing the illegitimate child from becoming a ward of the state.'" *Matter of M.D.H., supra, citing, J.E.G. v. C.J.E.* (1977), Ind.App., 360 N.E.2d 1030. Public policy considerations mandate that the state take an active interest in providing for the welfare of illegitimate children in order to avoid placing an undue financial burden on its taxpayers.

*Opinion* at 852. While undoubtedly that statement of policy is correct when the child in fact needs the financial support of both parents for its nurturing and upbringing, that is not the case here. In other words, B.M.T. will not want for either necessaries or education during her minority. Todd is gainfully employed and fully capable of providing for all the needs of the child she so desperately wanted. Under current public policy, the contract she signed here is valid and enforceable. Neither the legislature nor the judiciary can act to impair the obligations she incurred thereunder because the record demonstrates the child will never become a ward of the state.

I would reverse and remand with instructions to set aside the judgment and dismiss the petition.