Argued and submitted August 2, affirmed September 5, 2001

# Judy Ann WEAVER,
## *Respondent,*

*v.*

# Richard Linwood GUINN,
## *Appellant.*

## 99-2050-F-2; A110516

31 P3d 1119

Laurance W. Parker argued the cause and filed the brief for appellant.

Colette Boehmer argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

LANDAU, P. J.

## LANDAU, P. J.

In this filiation proceeding, father appeals the judgment of the trial court awarding mother custody of the child. Father argues that the trial court erred in declining to enforce the terms of an agreement between the parties concerning custody of the child. We affirm.

The parties stipulated to the following facts. Father and mother met in 1998 through a mutual friend who understood that father was interested in locating a woman who would be willing to be artificially inseminated and to carry a child to term and that mother might be interested in doing that under the appropriate circumstances. The parties reached a verbal agreement that mother would attempt to become pregnant with father's child through artificial insemination and would carry the child to term in exchange for $12,000, plus other costs and insurance. Mother further agreed that she would surrender the child to father, who would then be responsible for parenting the child.

In July 1998, father reduced their agreement to writing. Entitled "Artificial Insemination Surrogate Contract," the agreement begins by acknowledging that "this Agreement may be held unenforceable in whole or in part as against public policy." It then explains that its purpose is

"to provide a means for [father] to fertilize by Artificial Insemination the egg of [mother], who agrees to carry the embryo to term and relinquish custody of the child born pursuant to this Agreement to its Genetic Father * * *."

The agreement goes on to spell out various representations of the parties, selection of physicians to assist in the artificial insemination, medical instructions, and the like. The parties did not execute the agreement at that time.

Between July 1998 and September 1998, the parties agreed to engage in consensual sexual intercourse. Mother became pregnant in September 1998.

Seven months later, the parties signed the artificial insemination agreement. No amendment was made to reflect the fact that the parties subsequently had agreed to initiate the pregnancy by means other than artificial insemination.

On May 19, 1999, mother gave birth to the child. Meanwhile, by the date of the birth, mother had accepted approximately $12,000 in payments from father. On May 20, mother executed a "special consent" form acknowledging the paternity of father and permitting him to leave the hospital with the child in his custody. Three weeks later, mother initiated this filiation proceeding seeking custody of the child. Father acknowledged his paternity but asserted that, in accordance with the terms of the parties' agreement, he was entitled to exclusive custody of the child. Mother replied that the agreement did not apply and, in any event, was void as against public policy. According to mother, agreements regarding child custody cannot bind the courts in deciding what is in the best interests of the child.

The trial court held that the artificial insemination agreement did not apply, because mother did not become pregnant by artificial insemination. The court further held that the agreement was unenforceable as against public policy. The court then ordered an evidentiary hearing to determine the best interests of the child. At the hearing, mother testified that, although she had agreed that father would have custody of the child, she understood that she would have substantial visitation rights. Father testified that he agreed to nothing of the sort. After the hearing, the trial court awarded custody to mother, with substantial parenting time for father. The court found that both parents loved the child and were adequate and appropriate parents. The court's only expressed reservations were that, during one visitation, mother briefly had left the child in the care of a six-year-old and that father's apparently irremediable hostility to mother was detrimental to the child.

On appeal, father contends that the trial court erred in failing to enforce the contract between the parties. According to father, the fact that the written agreement speaks of artificial insemination is merely a technical matter of form that should not have sidetracked the court from the underlying substance of the agreement that mother was to bear a child and relinquish custody. Moreover, he argues, the agreement was not unenforceable as against public policy. Given changes in the technology of reproduction and public morals over the last several decades, he contends, it no longer can be

said that agreements to bear children for remuneration violate public policy.

Mother contends that the fact that the written agreement speaks of artificial insemination is not a mere technicality, but rather is a material term that was never performed. In any event, she argues, the trial court correctly concluded that such an agreement violates public policy against creating markets in the production of children.

■ ORS 109.239 spells out the rights of donors of semen used in artificial insemination:

"If the donor of semen used in an artificial insemination is not the mother's husband:

"(1) Such donor shall have no right, obligation or interest with respect to a child born as a result of the artificial insemination; and

"(2) A child born as a result of the artificial insemination shall have no right, obligation or interest with respect to such donor."

Clearly, the statute affords no relief to father in this case, and, indeed, father claims no support from that statute.

Father argues that, notwithstanding ORS 109.239, he has a right to sole custody of the child pursuant to the terms of the artificial insemination agreement. According to father, ORS 109.230 expressly authorizes such contracts in providing that "[a]ny contract between the mother and father of a child born out of wedlock is a legal contract," and in this case the parties' agreement expressly provides that father is to have custody of the child.

■ To begin with, ORS 109.230 does not apply to artificial insemination agreements. As we held in *McIntyre v. Crouch*, 98 Or App 462, 780 P2d 239, *rev den* 308 Or 593 (1989), that statute—which applies only to the "mother" and the "father" of a child born out of wedlock—was enacted long before the artificial insemination statute and before the legislature reasonably would have considered a semen donor to be a "father." *Id.* at 468.

■ Moreover, as the trial court concluded, the parties did not perform the terms of an artificial insemination agreement. The agreement clearly spells out that its purpose is "to provide a means for [father] to fertilize by Artificial Insemination" an egg of mother's. It contains representations as to mother's capability to carry an artificially inseminated embryo to term and medical instructions as to how the artificial inseminations are to be accomplished. The references to artificial insemination throughout the agreement are not mere formalities; they constitute material terms to an agreement that the parties simply never performed.

Father argues that, even if the written agreement does not apply, there was an oral agreement to produce a child by means other than artificial insemination, and that agreement, too, required mother to relinquish any claim to custody of the child. Mother responds that the stipulated facts contain no mention of such an oral agreement, and father relied on no such agreement at trial.

■ We agree with mother that father cannot seek the enforcement of an oral agreement that was not mentioned at trial. Moreover, even assuming the parties entered into an oral agreement, the record contains no evidence that its terms included a waiver of parental rights. In any event, such an agreement could not bind the courts in their determination of child custody.

■ ORS 109.175 provides that, in a filiation proceeding, once paternity has been established, the custody of the child must be determined in accordance with the standards set out in ORS 107.137. That statute, in turn, provides that, in determining the custody of a minor child, the court "shall give primary consideration to the best interests and welfare of the child." ORS 107.137(1). Agreements concerning the custody of children "are worthy of the court's consideration." *Laurence v. Laurence*, 198 Or 630, 638, 258 P2d 784 (1953). They may even constitute an admission on the question of parental fitness. *Id.* But they do not control the court's decision as to the best interests of the minor child. *Id.*; *see also Truitt and Truitt*, 124 Or App 531, 534, 863 P2d 1287 (1993) ("trial court is not bound by * * * agreements regarding the custody and visitation of minor children"); *Cope and Cope*, 49

Or App 301, 306, 619 P2d 883 (1980), *aff'd* 291 Or 412, 631 P2d 781 (1981) ("although the parties' stipulations regarding custody of their children are worthy of consideration, they are not binding on the trial court"); *cf. Leckie and Voorhies*, 128 Or App 289, 875 P2d 521 (1994) (waiver of parental rights in artificial insemination contract enforced).

■　　Father argues that, even if the trial court were entitled to award custody on the basis of the best interests of the child, the fact is that it is not in the best interests of the child to award custody to mother. In support of that argument, father relies on the single incident in which mother briefly left child in the care of a six-year-old. On *de novo* review, we conclude that—particularly in light of the substantial parenting time awarded to father—the trial court did not err in awarding custody to mother.

　　Affirmed.