Argued and submitted October 1, 2019, reversed and remanded for entry of judgment declaring the rights of the parties June 3, 2021

In the Matter of the Parentage of
Samuel Director Schnitzer, a Minor Child.

Cory Noel SAUSE,
*Petitioner-Respondent,*
*and*

Jordan Director SCHNITZER,
*Respondent-Appellant.*

Multnomah County
16DR18690

In the Matter of the Parentage of
Samuel Director Schnitzer, a Minor Child.

Jordan Director SCHNITZER,
*Petitioner-Appellant,*
*and*

Cassandra Lynn GIBEAUT
and Charles Burett Gibeaut,
*Petitioners below,*
*and*

Cory Noel SAUSE,
*Respondent-Respondent,*
*and*

Dale C. SAUSE
and Heidi N. Sause,
*Respondents below.*

Multnomah County
16DR19349;

A167020

493 P3d 1071

This action involves a dispute over the legal rights, status, and relationship of respondent Sause to a child, who, after being conceived by *in vitro* fertilization using appellant Schnitzer's sperm and an unfertilized egg that Sause had provided, was then carried and birthed by a gestational carrier. In legal proceedings that were initiated after the child was born, the parties sought determinations of their respective rights and interests as to the child. Sause asserted that she is the child's mother with all of the legal rights afforded that status, and Schnitzer

asserted that Sause had no parental rights to the child. The trial court entered a general judgment declaring Sause to be the child's legal mother and dismissed Schnitzer's petition, which sought a declaration that Sause was not the child's legal mother and an affirmance that he was the child's sole legal parent. On appeal, Schnitzer contends that the trial court erred in denying his motion to dismiss Sause's claim and in determining that Sause is the child's legal mother by virtue of being the child's undisputed female genetic parent and having taken every legal step available to her to protect and assert her constitutionally protected parental right. *Held*: The trial court erred in concluding, based largely on Sause's genetic connection to the child, that Sause is the child's legal mother. Because Sause did not establish a right to parent the child, the trial court erred in denying Schnitzer's motion to dismiss Sause's petition and in denying Schnitzer's request for a declaration that he is the child's sole parent.

Reversed and remanded for entry of judgment declaring the rights of the parties.

Amy Holmes Hehn, Judge.

James N. Westwood argued the cause for appellant. Also on the briefs were Stoel Rives LLP, Davis Wright Tremaine LLP, Stahancyk Kent & Hook PC, and Laurel Parrish Hook.

Jay W. Beattie argued the cause for respondent. Also on the brief were Lindsay Hart LLP, Thomas E. McDermott, Erin Gould, and Charles D. Gazzola.

Robin E. Pope filed the brief *amicus curiae* for Academy of Adoption and Assisted Reproduction Attorneys.

Before DeHoog, Presiding Judge, and Mooney, Judge, and Kamins, Judge.*

DeHOOG, P. J.

Reversed and remanded for entry of judgment declaring the rights of the parties.

Mooney, J., specially concurring.

Kamins, J., dissenting.

_____

* Kamins, J., *vice* Hadlock, J. pro tempore.

## DeHOOG, P. J.

This appeal involves a dispute over the legal rights, status, and relationship of respondent Sause to a male child, S, who, after being conceived by *in vitro* fertilization using appellant Schnitzer's sperm and an unfertilized egg that Sause had provided, was then carried and birthed by a gestational carrier (also known as a surrogate mother). After the child's birth, the parties initiated separate legal proceedings seeking a determination of their respective rights and interests as to S, and the trial court subsequently consolidated those actions.[1] Schnitzer asserted that Sause had no parental rights to S and that, even if she might otherwise have had such rights, she had knowingly waived them in a written contract with Schnitzer. Sause asserted that she is S's mother with all of the legal rights afforded that status, subject only to any express waiver of rights in the parties' contract. In that regard, Sause acknowledged that she had agreed to relinquish legal custody of any male embryos conceived with Schnitzer as part of the assisted reproductive technology (ART) process that she and Schnitzer had engaged in, and that she had further agreed that Schnitzer would have *sole legal custody* of any resulting male offspring; however, Sause denied that she had ever waived—or intended to waive—all legal rights to S or a parental role in his life. Following a multiday bench trial, the trial court entered a general judgment declaring Sause to be S's legal mother.[2] Schnitzer, who had sought a declaration establishing himself as S's sole parent, now appeals that judgment and raises five assignments of error.

In his first and second assignments of error, Schnitzer asserts that the trial court erred in concluding that Sause is S's "mother by virtue of being his undisputed female genetic parent" and having taken "every legal step available to her to protect and assert her parental rights and role in [S's] life." Put somewhat differently, Schnitzer asserts

---

[1] In the consolidated cases, appellant Schnitzer was the petitioner in one and the respondent in the other. We therefore refer to the parties by their last names rather than by their party designations below.

[2] The trial court dismissed with prejudice a filiation claim that Sause had asserted as an alternative basis of parentage. The dismissal of that claim is not at issue on appeal.

that the trial court erred in treating Sause's *biological* parentage as giving rise to a presumption of *legal* parentage and in ultimately concluding that Sause has a constitutionally protected parental right. In Schnitzer's third and fifth assignments of error, he contends that the trial court erred in failing to recognize that Sause had entered into a contract with him confirming that she had no parental rights as to S and by failing to enforce all of the terms of that contract. Finally, in Schnitzer's fourth assignment of error, he contends that, in light of his other arguments, the court erred in denying his claim for a declaration of sole parentage. For the reasons that follow, we agree with Schnitzer that the trial court erred in concluding, based largely on Sause's genetic connection to S, that Sause is his legal mother. That conclusion renders it unnecessary to reach Schnitzer's third and fifth assignments of error regarding the parties' contract; it also leads us to further conclude that, as asserted in the fourth assignment of error, Schnitzer is entitled to a declaration that he is S's sole legal parent.[3] We therefore reverse and remand for entry of a declaration to that effect.

## I.  BACKGROUND

### A.  *Standard of Review*

As an initial matter, we note that Schnitzer assigns error to the denial of his ORCP 54 B(2) motion to dismiss Sause's claim for a declaration of parentage, which he made at the conclusion of Sause's presentation of her case. However, Schnitzer also includes argument regarding the court's ultimate conclusions on the merits of the case pertaining to that same legal issue, which he raised midtrial.[4] Based on the substance of the parties' arguments, we understand

---

[3] Sause does not assert that the parties' contract *created* parental rights for her; rather, she argues that it "does not waive [her] parental rights in [S]. To the contrary, the agreement assumes [she] will have at least some opportunity to participate in [S's] life." (Emphasis omitted.)

[4] ORCP 54 B(2) provides, in part:

"After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment of dismissal against the plaintiff or may decline to render any judgment until the close of all the evidence."

Schnitzer to challenge both the trial court's denial of his ORCP 54 B(2) motion and its de facto denial of Schnitzer's renewed argument made during closing argument, which raise the same legal issue, albeit at different points in time. *See Larisa's Home Care, LLC v. Nichols-Shields*, 277 Or App 811, 812-13, 372 P3d 595 (2016), *rev'd on other grounds*, 362 Or 115, 404 P3d 912 (2017) (considering argument made during closing argument to be the functional equivalent of a motion to dismiss under ORCP 54 B(2) and concluding that, as presented in that case, the argument made on appeal was adequately preserved).

"On appeal of a denial of an ORCP 54 B(2) motion to dismiss a claim, we review the entire record to determine whether sufficient evidence was presented to establish a *prima facie* case on the applicable claim, viewing the evidence and all reasonable inferences that may be drawn from it in the light most favorable to" the party opposing the motion. *Marlow v. City of Sisters*, 281 Or App 462, 468, 383 P3d 908 (2016) (internal quotation marks omitted). In addition, "we review the trial court's legal conclusions for errors of law." *Id*.

B.   *Factual and Procedural History*

We begin by describing the pertinent facts in accordance with that standard, most of which are taken from the trial court's extensive written findings and conclusions of law. Schnitzer is a divorced father of two daughters, who wanted to add a son to his family. In early 2013, he began the process of becoming a parent through ART and worked with a program at Oregon Health & Science University (OHSU) Fertility Consultants. Because he had previously experienced contentious divorce and custody proceedings, he considered it important to have sole legal custody of any child produced through ART so that he could avoid any possibility of difficult custody litigation in the future. In 2013, he attempted to achieve a pregnancy via ART with an anonymous egg donor and a gestational carrier; however, that attempt did not result in a successful pregnancy.

In 2014, Schnitzer continued to work with OHSU and a gestational carrier in an effort to produce a son using embryos created with eggs from an anonymous donor.

Schnitzer met Sause early that year and the two developed an intimate relationship not long thereafter. In February, Schnitzer told Sause of his plans to have a son, which he continued to pursue. In April, pursuant to that plan, OHSU transferred an embryo that had been created using Schnitzer's sperm and an egg from the anonymous donor to the gestational carrier; however, Schnitzer learned on May 19 that, like the 2013 attempt, the April 2014 embryo transfer had not resulted in a successful pregnancy.

In the meantime—while her relationship with Schnitzer was ongoing—Sause decided to have her own eggs retrieved for independent purposes, unrelated to Schnitzer's plans to have a male child through ART. To that end, Sause met with her physician, Dr. Wu, at OHSU Fertility Consultants in early March 2014 to begin the process of having her eggs retrieved for fertility preservation purposes.

In April, as Schnitzer proceeded in his efforts with the anonymous egg donor and gestational carrier, he and Sause discussed the possibility of Sause gifting him her eggs to support that effort. Sause testified about her conversations with Schnitzer and acknowledged that he had made it clear that he wanted to have sole physical custody and wanted to raise the child. Sause explained, however, that, although it was clear that the child would not live with her, it had never occurred to her that she would not be known as the child's mother. Rather, she understood that she would be actively involved and that Schnitzer welcomed the thought of her as a part of the child's life. She told him that she would not seek financial payments from him and that she would give him custody. She thought that they were fully in agreement, and it did not occur to her to ask about the child's birth certificate.

In response to Sause's offer, Schnitzer told her that he would consider accepting the gift of her eggs only if she would sign the same documents as any anonymous donor would. Sause agreed to sign any documents necessary to transfer her eggs to Schnitzer.

On April 23, 2014, Sause shared the idea of donating her eggs to Schnitzer with her doctor. Wu wrote in a chart note that Sause "may wish to create embryos together with

her significant other" and that "she understands that contracts will need to be signed." Sause had her eggs retrieved on May 21, 2014.

Wu testified at trial that she had spoken with Sause by phone on May 29, 2014, and that they had discussed her plan to donate eggs to help Schnitzer have a son. Wu could not confirm having taken notes at the time of the phone call, but she said that her usual practice is to do so. On June 10, Wu entered a chart note about the May 29 call. That chart note indicated that Sause planned to donate any male embryos to Schnitzer and keep custody of all female embryos; it also stated that Sause "reports that their discussion and agreements have been that she will not have any future custodial or parenting rights to the male embryo(s) she donates to [Schnitzer], and likewise, [Schnitzer] will not have any future custodial/parenting rights to any future female offsprings [*sic*] that will result from her embryos." Wu testified that, to her, "embryo" and "offspring" are synonymous and that "it's a continuum and not so discrete. An embryo that results in a successful pregnancy and delivery is someone's offspring subsequently." The trial court's corresponding finding was that "it is likely that in this phone call Sause did indeed speak of a plan with Schnitzer to relinquish all of her rights to male embryos, and that Dr. Wu interpreted these statements through her professional 'lens' to mean more than Ms. Sause intended."

At Schnitzer's request, his business attorney, Nudelman, drafted a written agreement to reflect what he understood to be Sause and Schnitzer's agreement regarding *in vitro* fertilization and embryo transfer. Sause received a copy of that agreement on May 30, 2014, and requested a change, which Nudelman incorporated. Sause signed the revised agreement (the Agreement) on June 2, 2014. On June 6, Sause signed a standard OHSU "Informed Consent for Egg (Oocyte) Donation" form, which became an attached exhibit to the Agreement, referred to within the Agreement as the "Donation." Schnitzer signed a form on June 9, 2014, entitled "Directed Sperm Donor Consent Form," which was likewise attached as an exhibit to the Agreement and referred to within it as the "Form"; he also signed the Agreement itself. During the litigation leading

to this appeal, Sause executed a declaration in which she characterized the Agreement, stating, among other things, that it "reflected accurately that * * * Schnitzer did not want anything to do with any girls resulting from our embryos, financial or otherwise. It also accurately reflected my oft-stated intent to maintain my parental rights to any resulting male offspring."

The recitals of the Agreement state, in part, that "Schnitzer and Sause intend for this Agreement to supplement the Form and Donation in connection with the *in vitro* fertilization and embryo transfer (IVF-ET) anticipated by those documents." The Agreement itself, which is just over two pages in length, provides, in part:

"1. <u>Designation of Embryos</u>. Notwithstanding anything to the contrary in the Form or Donation, Schnitzer hereby relinquishes any claim to or jurisdiction over any female embryos from Sause and any resulting female offspring that might result from the use of Sause's eggs. Sause confirms and acknowledges that Schnitzer has full jurisdiction [and] custodial rights over the future disposition of male embryos created from her eggs and she renounces any rights and responsibilities of custody of any male embryo.[5] Schnitzer and Sause shall take any [and] all necessary and appropriate steps to effectuate the desired outcome of this Agreement including but not limited to the execution of any forms, releases or statements of any kind to Oregon Health & Science University or any other third-party that relate or pertain to the ownership or disposition of the embryos as set forth in this paragraph.

"2. <u>Notice of birth/Post-birth contact and communication with child</u>. In the event of a birth of a male child from

---

[5] At trial, Schnitzer contended that this particular reference to "embryo" was intended instead to reference "offspring," so as to parallel the references to female embryos and female offspring in the first sentence of this section of the agreement. Sause argued otherwise. The concurrence contends that, under the parol evidence rule, evidence of the parties' precontract discussions may be inadmissible to vary the terms of the parties' ultimate integrated agreement. 312 Or App at 110-11 (Mooney, J., specially concurring) (discussing ORS 41.740). While, in the abstract, that is true—and our disposition here does not rely on the meaning of the disputed terms of the Agreement—it is worth noting that, to the extent Sause would rely on the circumstances surrounding the formation of the Agreement to establish that the agreement is ambiguous, that evidence would likely be admissible. *See Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 314, 129 P3d 773, *rev den*, 341 Or 366 (2006).

one of Sause's eggs that has been fertilized by Schnitzer's sperm, Schnitzer shall give Sause notice within five (5) days of the date of the birth. In the event of a birth of a female child from one of Sause's eggs that was fertilized with Schnitzer's sperm, Sause shall give Schnitzer notice within five (5) days of the date of the birth. The parties agree that upon mutual written agreement of the parties, and upon receipt of advice, counsel and approval of third-party independent medical and psychological consultants, any offspring produced from an embryo may be introduced to Schnitzer or Sause, as the case may be. Thereafter, the parties agree that if it is determined to be in the best interests of the child, Schnitzer and/or Sause (and their respective families), as the case may be, may have [an] active role in the life of the child.

"3.   Release. Sause confirms she has executed this Agreement and the Donation voluntarily with no expectation of remuneration of any kind from Schnitzer now or in the future. Sause further confirms Schnitzer has no liability to pay any of her debts or other obligations that relate or pertain to the embryos or a resulting child. Sause releases and waives Schnitzer from any and all claims, suits, or causes of action for compensation, support, or remuneration of any kind of nature that relate to the embryos and any resulting child. Schnitzer releases and waives Sause from any and all claims, suits, or causes of action for compensation, support, or remuneration of any kind of nature that relate to the embryos and any resulting child.

"* * * * *

"5.   Entire Agreement/Assignment. Together with the Form and the Donation, this Agreement constitutes the entire agreement and understanding of the parties, and supersedes all prior and contemporaneous agreements, understandings, negotiations, and purposes, whether written or unwritten. This Agreement may not be amended or modified except in writing signed by each of the parties hereto. In the event of any conflict or inconsistency between the terms and conditions of the Form or Donation and the terms and conditions of this Agreement, the terms and conditions of this Agreement shall prevail."

It is undisputed that the donation form that Sause signed was not entirely accurate in that it reflected that she was agreeing to donate her eggs to "an unknown infertile

recipient" and that her "identity will be kept confidential from the recipients and that the recipient identities will be kept confidential from" her. The donation form also includes a paragraph that states:

> "I understand that I do forever hereafter relinquish any claim to or jurisdiction over the embryos and offspring that might result from the use of my eggs for In Vitro Fertilization. I acknowledge that the recipients have full custodial rights over the future disposition of embryos created from my eggs and that these rights include their use for reproductive purposes of the recipient, donation of unused embryos for research (which might include stem cell research), disposal of unused embryos, or donation of unused embryos to another infertile couple."

The form signed by Schnitzer stated that he agreed "to be a donor of sperm which will be used for therapeutic insemination of [Sause] only and will never be used for therapeutic insemination of any other recipient" and that Sause "requested and agreed to be therapeutically inseminated with" his sperm. Schnitzer also acknowledged in the form that determination of parental rights and responsibilities "should be properly determined by the directed sperm donor and recipient under the counsel of legal advisors."

In June 2014, OHSU used Sause's donated eggs and Schnitzer's sperm to create embryos. Genetic testing revealed that there were three viable male embryos and no viable female embryos. On July 9, Sause signed a consent form to relinquish control of the three male embryos to Schnitzer so that he could "attempt to establish a pregnancy in a gestational carrier." That consent form also stated that "any claim to or jurisdiction over offspring that might result from this embryo transfer(s) is covered by separate contract between" Sause and Schnitzer. In late July, Schnitzer had one of the three embryos transferred into the gestational carrier with whom he had previously worked, but that first embryo transfer did not result in a successful pregnancy.

In February 2015, Schnitzer entered into a written surrogacy contract with a new gestational carrier and her husband, which included a clear and explicit waiver of their rights to the child and an explanation that the child was

being conceived for the intended father, Schnitzer. Sause did not take part in the selection of the new gestational carrier, and Schnitzer did not invite Sause to be a party or signatory to the surrogacy contract. In April of that year, the second of the three male embryos in Schnitzer's custody was transferred to the surrogate, who had a successful pregnancy and, ultimately, gave birth to S. Sause learned of the pregnancy on May 7. At around that same time, Schnitzer and Sause's relationship began to cool. Sause did not believe that she and Schnitzer were meant to be in a long-term romantic relationship. Schnitzer, on the other hand, continued to hope that they would marry and raise the child together.

Schnitzer maintained contact with Sause or her parents throughout the surrogate pregnancy. As S's birth approached, Schnitzer sent the Sause family updates via text messages. S was born on December 22, 2015. Schnitzer was at the hospital and sent multiple photos to the Sause family. Sause and her parents went to the hospital and each was permitted to hold S. Shortly after S's birth, Schnitzer and Sause had a disagreement because, for various reasons not pertinent to this appeal, Schnitzer had decided that S would go home from the hospital with the surrogate and stay with her for a while. Sause was upset by that decision, and she sent a series of hostile text messages to Schnitzer. The trial court expressly found that "it was at this moment, and not before, that Schnitzer made the decision to cut Sause and her family out of [S's] life."

The day after S's birth, Schnitzer filed a petition for a general declaratory judgment of parentage, naming the surrogate and her husband as respondents. Schnitzer did not name Sause as a party to that action. Schnitzer, the surrogate, and the surrogate's husband all signed a stipulated judgment stating that Schnitzer was S's sole parent. The trial court signed that judgment on December 28, 2015. On March 3, 2016, Sause filed a motion to intervene in that action. After a multiday contested hearing, the trial court denied the motion to intervene, and, on September 2, 2016, signed an order reflecting that denial.

Shortly thereafter, Sause initiated a new action in Coos County, where she lived, petitioning for filiation and

declaratory judgment as to S's parentage. Schnitzer, in turn, filed an action of his own in Multnomah County, where he lived, petitioning in that case for declaratory judgment regarding egg donor status and parentage.[6] Those actions, which collectively are the subject of this appeal, were consolidated for trial in Multnomah County. The trial court described the issue to be decided as "whether Sause intended to relinquish legal control of just male *embryos* to Mr. Schnitzer or also all rights whatsoever to male *offspring*." (Emphases in original.)

At the conclusion of Sause's presentation of evidence at trial, Schnitzer moved under ORCP 54 B(2) to dismiss Sause's claim for a declaration of parentage. He argued, in part, that Sause had "not adduced sufficient evidence to establish a parental right ab initio."[7] The trial court orally denied Schnitzer's motion to dismiss. The court stated:

> "So, bottom line is that * * * I have a whole 'nother side of the case to hear, and I have further and final legal argument to hear. I'm simply finding that, as of today, I choose to—I choose not to disregard and disbelieve Ms. Sause's testimony, and I do find that she's established a prima facie case in support of her claim that she has a parental right, which The Court must honor and respect."

Schnitzer raised the same legal issue again during closing argument, arguing that Sause did not have a legal right, constitutional or otherwise, to S. In December 2017, approximately two years after S was born, the trial court issued written findings of fact, conclusions of law, and rulings, which state, in part:

> "Sause is [S's] mother by virtue of being his undisputed female genetic parent. It is true, as both sides to this dispute have acknowledged, that genetics alone do not a parent make. A person linked to a child only by genetics

---

[6] At the time Schnitzer filed his petition, the surrogate and her husband were listed as copetitioners in the lawsuit and Sause's parents were named as respondents along with her. Those four parties were dismissed during the litigation and are not parties to this appeal.

[7] Schnitzer also sought to dismiss Sause's filiation claim under ORS 109.125. Although the trial court denied that part of Schnitzer's motion at that time, the court ultimately dismissed the filiation claim at the end of the bench trial. The dismissal of that claim is not at issue on appeal.

must take 'an affirmative step to accept the responsibilities associated with parenthood.' \*\*\* Up until the time [S] was born, both Schnitzer and Sause understood that while Schnitzer would have full legal and physical custody of [S], Sause would play a 'maternal' role in his life. \*\*\* It was only when the dispute arose over [S's] time with the [surrogate] post-birth that Schnitzer changed his mind about Sause's role and then took all available legal steps to eliminate her and her family from [S's] world. Sause saw and held [S] on the day of his birth but has never been allowed to see him since. As soon as Schnitzer's change of heart became evident, Sause took legal action to assert her right to a role in [S's] life, which she has consistently, diligently and unwaveringly pursued to this day.

"Schnitzer cites cases that stand for the proposition that a parent's 'frustration' of the other parent's efforts to involve him or herself in the life of a child are not enough to grant parental rights. The Court finds the facts of those cases to be very different from the case before the Court, where Schnitzer began his frustration of Sause's efforts to claim her role as [S's] mother essentially on the day [S] was born. Sause thereafter took every legal step available to her to protect and assert her parental rights and role in [S's] life, a role which the Court finds Schnitzer *agreed with and actively encouraged* up to and including the day of [S's] birth."

(Emphasis in original.) The trial court's general judgment incorporated its written findings, conclusions, and rulings:

"In accordance with ORS 28.101, the court issues a Declaratory Judgment that Cory Sause is the legal mother of the child, [S], subject to the terms of the Findings of Fact, Conclusions of Law and Rulings attached hereto and incorporated herein."

In the same judgment, the trial court dismissed Schnitzer's petition for declaratory judgment in which he sought a declaration of sole parentage.

C.   *The Issues on Appeal*

Schnitzer appeals that general judgment. Schnitzer's first two assignments of error are related, so we consider them together. In his first assignment, Schnitzer contends that Sause did not have any parental right based solely on a

donation of her genetic material. According to Schnitzer, the trial court erred in ruling *sua sponte* that a female gamete donor is the undisputed "genetic parent" of a resulting child, positioned by that fact alone to attain full parental rights. In his second assignment of error, Schnitzer contends that, even if Sause qualified as a "genetic parent" from the start, she provided no evidence that her actions met the applicable constitutional tests for legal parenthood.

Schnitzer argues that the trial court presumed that Sause's gamete donation made her a "genetic parent," one who would acquire the rights of a full legal parent if she also took a constitutionally sufficient "affirmative step to accept the responsibilities" of parenthood. According to Schnitzer, however, the law is to the contrary, and a donor's biology creates no "presumption of parenthood." In Schnitzer's view, a gamete donor of either sex has no parental right based on that fact alone. In response, Sause takes the opposite view, contending that, under applicable Oregon statutory and common law, her status as one of S's two biological parents carries with it at least some rights in, and responsibilities for, S. According to Sause, a biological mother is a legal mother; thus, there was no need for her to establish that she had a constitutionally protected liberty interest in parenting S simply to appear on his birth certificate or to have, at a minimum, the legal right to seek parenting time, which are what she sought through her petition for declaratory relief.[8] Sause does not point to any specific statute or other source of law to support her contention that genetic parentage carries with it some degree of parental rights, but she advances a general argument that "the term 'parent' or 'parentage' used in ORS Chapter 109 refers to biology, *viz*, the 'genetic relationship between parent and child.'" Sause further argues that, to the extent that she was required to show more than a mere genetic connection to establish

---

[8] A female gamete donor who participates in ART but does not give birth to the resulting child is not automatically listed on the child's birth certificate as is a woman who does give birth to a child. *See* ORS 432.088(8) (For purposes of reporting a live birth and live birth registration under Oregon's vital statistics statutes, "the woman who gives live birth is the birth mother. If a court of competent jurisdiction determines that a woman other than the birth mother is the biological or genetic mother, the court may order the state registrar to amend the record of live birth.").

parental rights, she has done so, as the trial court correctly, in her view, concluded.

## II. ANALYSIS

As set out above, the trial court's ruling could be understood to echo Sause's reasoning that she need not prove more than a genetic connection to establish legal parentage, in that the court stated that "Sause is [S's] mother by virtue of being his undisputed female genetic parent." However, as both sides to this dispute acknowledged at trial, genetics alone do not a parent make. And, as the trial court expressly noted, a "person linked to a child only by genetics must take 'an affirmative step to accept the responsibilities associated with parenthood.'" Thus, we understand the court's ruling not to be that Sause's genetic connection to S made her a "mother" in the sense of having parental rights arising solely from that status, but, rather, that Sause's biological relationship to S provided a link that, under certain circumstances, could form a basis for acquiring a legal, parental relationship. As we explain, we agree with the trial court that, although genetics provide a connection to the child that a biological stranger does not have, Sause's genetic connection alone did not confer parental rights. We disagree, however, that Sause made the requisite additional showing to acquire those rights.

To provide further context for our analysis, we begin by making several observations. This case arises under arguably unique factual circumstances. First, before meeting Sause, Schnitzer had decided that he wanted a son and was independently pursuing that objective via ART. Sause and Schnitzer were, for at least some time, romantically involved, but they were not married and had no joint intention to raise a family together. And, as the trial court found, Sause and Schnitzer had discussed the idea of "Sause offering Schnitzer her eggs as a gift to assist him in his efforts to have another child," and "Schnitzer informed her that he would only consider accepting the gift of her eggs if Sause signed the same documents as any other anonymous donor."

Second, before S was born, the parties had relatively defined, if somewhat divergent, expectations as to the

role that they each would play—or be entitled to play—in S's life. Sause anticipated playing a maternal role in S's life, although Schnitzer would have full legal custody and accept all of the financial responsibility for raising the child. Schnitzer, on the other hand, hoped that Sause would marry him and that the two of them would therefore raise the child together, but, even though the court found that Schnitzer, like Sause, had anticipated that she would play a maternal role in S's life, nothing in the record or the court's findings reflects a promise by Schnitzer to give Sause some role in S's life even if the parties' romantic relationship ended.

Third, although the parties entered into a written agreement that arguably addressed their respective rights regarding a male child such as S, the positions that the parties take on appeal and our conclusions regarding Schnitzer's first two assignments of error ultimately render that agreement immaterial. That is, Sause does not assert that her claimed parental rights arise from the agreement she entered into with Schnitzer or any of the forms that she or Schnitzer executed; rather, taking a position somewhat different from the one that she took at trial, Sause now contends that she is entitled to be named as S's mother on his birth certificate and to have parenting time with him based solely on the fact that she is biologically related to him. As noted, Sause further contends that, to the extent that she was required to show more than that biological connection to establish constitutionally protected parenting rights as to S, she has done so here.

We begin our analysis with a discussion of the legal setting in which the parties litigated their claims. At the time of trial, Oregon did not have a statute that directly addressed female gamete (*i.e.*, egg) donation.[9] There was,

---

[9] In 2017, the legislature passed Senate Bill (SB) 512, which modified a number of laws regarding the establishment of the parentage of a child, including laws pertaining to the rights and responsibilities of male and female gamete donors and children conceived through ART. Or Laws 2017, ch 651, § 4. The trial court issued its written post-trial rulings on December 5, 2017, but it did not enter a judgment incorporating those rulings until January 18, 2018, by which time SB 512 had gone into effect. Or Laws 2017, ch 651, § 4. At the time it made its post-trial rulings, the trial court acknowledged that the new law would soon go into effect and that it was designed to prevent the type of litigation before it. The court reasoned, however, that it was "not the law now" and that, although it

however, a statute in effect, ORS 109.239 (1977), *amended by* Or Laws 2017, ch 651, § 4, that addressed the rights and obligations of sperm donors and the rights and obligations of children resulting from artificial insemination as follows:

> "If the donor of semen used in artificial insemination is not the mother's husband:
>
> "(1)   Such donor shall have no right, obligation or interest with respect to a child born as a result of the artificial insemination; and
>
> "(2)   A child born as a result of the artificial insemination shall have no right, obligation or interest with respect to such donor."

Thus, had Schnitzer donated his sperm so as to allow Sause or a surrogate to become pregnant, he would presumptively have had no rights as to any resulting child. Schnitzer urges us to reach the same result here as to Sause's rights to S. Schnitzer points out that, at the time that ORS 109.239 was enacted, ART was new science, no *in vitro* baby had ever been born, and female gamete donation did not exist;[10] as a result, the legislature that enacted ORS 109.239 (1977) had no reason to make the statute applicable to anyone other than male gamete donors. Schnitzer posits, however, that the statute embodies a principle broader than the one that it explicitly encompasses. In Schnitzer's view, ORS 109.239 (1977) confirmed, rather than established, law when it provided that nonspouse male gamete donors did not have parental rights. And, because the statute could be viewed as merely embodying an established common-law principle in Oregon rather than enacting new law, that common-law principle was—and, Schnitzer would contend, remains—applicable independent of ORS 109.239. Schnitzer

was "interesting and it does provide some context and some history and where the future is headed in this field," it was not essential to the court's ruling. It is evident from those comments in the court's December 2017 ruling and the parties' arguments at trial, which was held before the effective date of SB 512, that it was understood that the new law would not apply to the trial court's decision in this case. The belated briefing on appeal in support of applying SB 512 has not persuaded us otherwise.

[10] The *amicus curiae* brief filed by the Academy of Adoption and Assisted Reproduction Attorneys states that we now have "technology that potentially allows multiple women to claim rights as a mother (the intended mother, an egg donor, an embryo donor, and a gestational surrogate)."

further reasons that, if the common-law rule ostensibly at the root of the statute—that *unmarried* gamete donors have no parental rights—were applied to Sause, a female gamete donor, she would have no right, obligation, or interest with respect to S.

In response, Sause emphasizes the plain text of ORS 109.239 (1977) and, advancing a more literal reading of its terms than Schnitzer does, argues that it applies only to sperm donors, not to egg donors, and therefore cannot apply to her. We agree that ORS 109.239 (1977) does not on its face apply here; however, it is nonetheless somewhat instructive, because it provides at least some insight into Oregon law regarding gamete donors in that it recognizes a distinction between a male gamete donor whose semen is used for ART by a person he is not married to from men who father children in other ways.[11]

Turning to the case law, both parties rely for different purposes on our plurality decision in *McIntyre v. Crouch*, 98 Or App 462, 780 P2d 239, *rev den*, 308 Or 593 (1989), *cert den*, 495 US 905 (1990). In *McIntyre*, the petitioner sought a declaration that he was the father of a child that the respondent, an unmarried woman, had conceived by artificial insemination using the petitioner's semen. *Id.* at 464. The petitioner claimed that, in donating his semen for that purpose, he had relied on an agreement with the respondent "that he 'would remain active' in the child's life and 'participate in all important decisions concerning the child' and that he would have visitation rights." *Id.* The respondent denied

---

[11] The *amicus* brief states that "the 2014 passage of Ballot Measure 89, Oregon's Equal Rights Amendment, amended Article I, Section 20 of the Oregon state constitution to guarantee that 'equality of rights under the law shall not be denied or abridged by the state of Oregon or by any political subdivision in this state on account of sex,' support[s] the legal argument that all gamete donors [are] covered by Oregon's sperm donor statute." The concurrence agrees. 312 Or App at 108 (Mooney, J., specially concurring). However, Sause did not address that assertion, and, although Schnitzer adopts it in his reply brief, he does not develop any argument in support of it. Moreover, even if various biological and other differences between producing male gametes and retrieving female gametes were insufficient to justify treating their respective donors differently under the Oregon Constitution, that would not obviate the need to address Sause's federal due process rights. In light of the need to address those rights, as well as our disposition of Schnitzer's appeal on other grounds, we do not address the potential implications of Ballot Measure 89 here.

that claim. *Id*. The petitioner argued that ORS 109.239 (1977) did not apply under the circumstances and that, if it were to apply, it would violate his constitutional due process rights as a parent. 98 Or App at 466-67. Acknowledging the statute's unequivocal language, we concluded that it "bar[red] petitioner from the rights and responsibilities of fatherhood, even if respondent had agreed with him before he gave her his semen that he would have these rights and responsibilities and he gave his semen in reliance on that agreement." *Id*. at 468. We explained that the legislation regarding artificial insemination, of which ORS 109.239 (1977) had been only a part, served several purposes, among them "to resolve potential disputes about parental rights and responsibilities," by, among other things, ensuring that "an unmarried mother is freed of any claims by the [semen] donor of parental rights." *Id*. at 467-68. Ultimately, however, we determined that the statutory bar of ORS 109.239 (1977) might prove unconstitutional as applied to the petitioner if he could establish, as he had asserted in a declaration, that he had donated his sperm in reliance on an agreement that he would have the rights and responsibilities of fatherhood, a factual matter that we left for the trial court to determine on remand. *Id*. at 472.

Schnitzer asserts that *McIntyre* stands for the following three principles: (1) no protected parental interest arises from a donor's biological link to a child; (2) without evidence to support a claim that a child's parent has contractually promised parental status to a donor, who would not otherwise have made the donation, the donor cannot establish a *prima facie* case of entitlement to parental rights; and (3) even if such a claim is advanced, the donor still must satisfy the criteria of parenthood established by United States Supreme Court case law. Schnitzer also suggests that we should adopt the dissenting opinion in *McIntyre*, which would simply have held that ORS 109.239 (1977) barred the petitioner from obtaining parental rights and that applying the statute to the petitioner raised no constitutional concerns. 98 Or App at 474 (Richardson, P. J., dissenting).

Schnitzer further emphasizes that, to the extent that *McIntyre* might be viewed as recognizing a gamete donor's parental rights notwithstanding ORS 109.239 (1977),

that case is factually distinguishable. Specifically, to the extent that the parties in that case had entered into an agreement that might have entitled the petitioner to parental rights, that was not the case here. As Schnitzer notes, the alleged agreement in *McIntyre* gave the petitioner a specific visitation schedule and provided that he would be allowed to participate in all significant decisions as to the child; furthermore, the petitioner had declared his readiness to share financial responsibility for the child's support. 98 Or App at 464. Here, in considerable contrast, Sause asserted only that the parties had intended that she would be S's mother and that he would know her as such. Unlike the petitioner in *McIntyre*, Sause acknowledged in this case that she always understood that Schnitzer would have full legal custody and decision-making authority, that there was no agreed-upon visitation schedule, and that she would bear no financial responsibility for S whatsoever.[12]

For her part, Sause relies on the concurring opinion in *McIntyre* for its discussion of the legislative history of ORS 109.239 (1977), particularly its observation that the act was in part designed to "*relieve* the sperm donor and the child of any rights or obligations toward one another *when neither the donor nor the mother intended that the donor be the legal father.*" *Id*. at 473 (Deits, J., specially concurring) (emphases added). According to Sause, that statement from *McIntyre* reflects the legislature's understanding that, in the absence of a statute providing otherwise, a sperm donor would presumptively have had rights and obligations regarding the resulting offspring. Sause reasons that, if, at the time the legislature enacted ORS 109.239 (1977), the existing statutory or common law did not already extend parental rights to sperm donors, there would have been no need for a provision terminating those rights.

Notwithstanding a certain logical appeal to Sause's argument, we find no support for it in our statutory or decisional law. Rather, we are persuaded that *McIntyre* supports the trial court's understanding (and Schnitzer's contention)

---

[12] In fact, as noted above, rather than having any guaranteed time with S, Sause signed an agreement that specified that offspring "may be introduced to" her and left open the possibility for her to have an active role only if it was determined to be in the best interests of the child.

that, under the law governing the trial court's decision, the mere genetic connection that a gamete donor has to a resulting child does not, in its own right, confer parental status.[13] We reach that conclusion in part due to our reliance, in *McIntyre*, on the United States Supreme Court's decision in *Lehr v. Robertson*, 463 US 248, 103 S Ct 2985, 77 L Ed 2d 614 (1983). *McIntyre,* 98 Or App at 470-71. As we explained in *McIntyre*, the issue in *Lehr* was whether, to provide due process, an "unmarried father, whose child was conceived by sexual intercourse, had to have notice and an opportunity to be heard before the child could be adopted by others." *McIntyre*, 98 Or App at 470. In deciding that question, the Supreme Court "discussed the significance to the man's rights and responsibilities of fatherhood of the biological connection between the man and the child." *Id*. The Court explained:

> "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the due process clause. * * * But the mere existence of a biological link does not merit equivalent constitutional protection. * * *
>
> "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie."

---

[13] As noted, 312 Or App at 86 n 9, the trial court did not apply SB 512 (2017) to its determination of the parties' respective rights. Citing *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997), the concurrence suggests an obligation to construe and apply SB 512 notwithstanding the parties' failure to rely on—or advance an interpretation of—that provision at trial. *See* 312 Or App at 107 (Mooney, J., specially concurring). However, this is not a case in which the parties have simply failed to articulate a particular interpretation of a statute that necessarily controls their controversy. Rather, by declining to rely on that provision, they have not put its meaning or application at issue in this case, and *Stull* does not require that we apply it to the parties' dispute *sua sponte*.

*Lehr*, 463 US at 261-62 (internal brackets, quotation marks, and citations omitted). We discuss *Lehr* at greater length below, 312 Or App at 95-96. For now, however, we simply note that we understand *Lehr*, and our reliance on that decision in *McIntyre,* to stand for the proposition that a biological connection presents an opportunity for a would-be parent, but that connection does not, in and of itself, create parental rights.

Our decision in *State v. Wooden*, 184 Or App 537, 57 P3d 583 (2002), further supports the conclusion that Sause's biological link to S alone is not sufficient to establish parental rights. *Wooden* involved a custody dispute between the maternal grandparents of a child and the child's father. 184 Or App at 540. There, the child's parents had never been married to each other, but the child's paternity was not in dispute. *Id.* The child's mother had left the father and married another man when the child was three or four. *Id.* That man had subsequently murdered the mother, and the child's grandparents had then filed for and received custody. *Id.* at 540-43. The father disputed the custody award on appeal. *Id.* at 543. He had maintained at least sporadic contact with the child both before and after the mother married, and he had stopped all visitation only after her "violence-prone husband" had insisted that he stay away. *Id.* at 550. The father had also paid approximately two-thirds of his support obligation for the child, who by then was six years old. *Id.* In defending the trial court's custody award, the grandparents argued that the father had in essence waived his parental rights by failing to participate directly and significantly in the first six years of the child's life. *Id.* at 546.

We held in *Wooden* that the father did have a parental right to his child, but not one arising from his biological connection alone. *Id.* at 550. We explained that the "[f]ather's parental right, if he has it, derives from the Due Process Clause of the Fourteenth Amendment." *Id.* at 546. And, after a recitation and brief discussion of several United States Supreme Court cases, we gleaned the following:

> "In sum, all of the cases containing language that might be taken to imply that parental rights derive from a mere biological connection actually imply nothing of the

sort. They do not stand for the proposition that the state must grant the opportunity to exercise care, custody, and control to those who have not participated directly and significantly in the upbringing of their children. Rather, they establish that parents who have, or once had, care, custody, and control of their children may not be deprived of those benefits by the state without due process of law.

"In fact, when the cases deal with nonparticipating or minimally participating biological parents, they expressly announce that parental rights are *not* biologically based."

*Id*. at 548 (emphasis in original).

Thus, although we concluded in *Wooden* that the father had a protected parental right to his child, we reached that conclusion only after considering the father's efforts to maintain contact and provide support for the child after the mother had left him, the barriers that existed to maintaining better contact, and the father's considerable efforts following the mother's death, which included his insistence on paying full support and his "near-perfect record of regular visitation." 184 Or App at 550 (discussing whether, in the words of *Lehr*, 463 US at 262, the father had sufficiently grasped the opportunity to develop a relationship with his child and "accept[ed] some measure of responsibility for the child's future" (internal quotation marks omitted)).

That case law persuades us that, contrary to Sause's position on appeal, her mere biological connection to S does not confer parental rights on her. We therefore turn to whether, in this case, Sause had established a protected parental interest in S through something other than that biological connection. Schnitzer contends in his second assignment of error that she has not established such an interest. Schnitzer argues that, even if Sause's biological relationship to S provided her with a "presumption" of parental rights, she has failed to establish a constitutionally protected parental right as necessary for her to be declared S's legal mother. Sause responds that, if she must prove that she has a constitutionally protected "liberty interest" in parenting S to be considered his legal mother, she has done so here. That is, she argues that, at the earliest possible chance, she grasped the opportunity to participate in the

rearing of S in a manner sufficient to establish her parental rights.[14]

As recited above, the trial court ruled that a combination of (1) Sause's actions to assert her right to a role in S's life and (2) Schnitzer's actions that prevented Sause from claiming that role satisfied the constitutional standard for establishing a parental right. Specifically, the court found that there had been an understanding between Schnitzer and Sause that Sause would have a "maternal" role, with Schnitzer having full legal and physical custody; that Schnitzer had unilaterally changed his mind about that intention; and that Sause had held S on the day that he was born and had taken "every legal step available to her to protect and assert her parental rights and role" in S's life after Schnitzer cut off her access to S. As the trial court explained:

> "Up until the time [S] was born, both Schnitzer and Sause understood that while Schnitzer would have full legal and physical custody of [S], Sause would play a 'maternal' role in his life. This intention is expressed in the Nudelman Agreement. It was only when the dispute arose over [S's] time with the [surrogate] post-birth that Schnitzer changed his mind about Sause's role and then took all available legal steps to eliminate her and her family from [S's] world. Sause saw and held [S] on the day of his birth but has never been allowed to see him since. As soon as Schnitzer's change of heart became evident, Sause took legal action to assert her right to a role in [S's] life, which she has consistently, diligently and unwaveringly pursued to this day.
>
> "*** Schnitzer began his frustration of Sause's efforts to claim her role as [S's] mother essentially on the day [S] was born. Sause thereafter took every legal step available to her to protect and assert her parental rights and role in [S's] life, a role which the Court finds Schnitzer *agreed with and actively encouraged* up to and including the day of [S's] birth."

(Emphasis in original.)

Schnitzer argues that the trial court misapplied the applicable case law in concluding that Sause had established

---

[14] We note that Sause has not cross-assigned error to the trial court's ruling that such a showing was required in this case.

a protected parental right. He further contends that, to the extent that the decisions of the United States Supreme Court might otherwise be viewed as supporting the trial court's decision, they cannot provide that support here, because there is a significant distinction between those cases and the present case. That is, in each of the cases that the trial court considered the claimant's biological link was natural parenthood; none of the cases address a gamete donor's parental rights. We proceed to consider those cases.

In *Lehr*, the Court considered whether a biological father of a child born out of wedlock had an absolute right to receive notice prior to the child's adoption by the mother's husband. 463 US at 250. The State of New York had a putative-father registry in which a man could file his intent to claim paternity of a child born out of wedlock, which would then entitle him to receive notice of any proposed adoption. *Id*. at 250-51. The biological father did not register and therefore did not receive notice. *Id*. In holding that the father had not established a right to such notice, the Court explained that

> "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he acts as a father toward his children. But the mere existence of a biological link does not merit equivalent constitutional protection. *** The importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children. . . as well as from the fact of blood relationship."

*Id*. at 261 (internal brackets, quotation marks, and citations omitted).

The dissent in *Lehr* highlighted facts that the majority opinion had not acknowledged, including, notably, that the father had visited the mother and child in the hospital following the child's birth, but that, upon leaving the hospital, the mother had concealed her whereabouts from him. *Id*. at 269 (White, J., dissenting). The father attempted,

with sporadic success, to find the mother and child, and he would visit with the child to the extent the mother would allow. *Id*. When, after having been unable to find them for at least a year, the father again tracked them down, he discovered that the mother had since married and would no longer permit him to see the child. *Id*. The father offered financial assistance and threatened the mother with legal action. *Id*.

The mother and her husband then began adoption proceedings without providing the father with notice. *Id*. Notwithstanding the facts that the dissent in *Lehr* had emphasized, the majority in that case held that, under the circumstances, notice was not constitutionally required, as any constitutionally protected interest that the father had in the matter was adequately protected by the state's registry for putative fathers *Id*. at 265. Notably, in observing that the father "has never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until after she was two years old," *id*. at 262, the majority evidently did not deem the facts that the dissent found particularly noteworthy— facts arguably depicting one parent's purposeful thwarting of the other parent's efforts to develop a relationship with a child—to be legally significant.

In *Quilloin v. Walcott*, 434 US 246, 98 S Ct 549, 54 L Ed 2d 511 (1978), the court considered the constitutionality of Georgia's adoption laws, which operated to deny an unwed father the ability to prevent the adoption of his biological child by the mother's husband. In that case, the parents had not been married when the child was born, the mother had married a different man when the child was about three years old, and, when the child was 11, the mother's husband had filed a petition to adopt the child. 434 US at 247. In response to the adoption petition, the biological father attempted to block the adoption and to secure visitation rights, but he did not seek custody. *Id*. The Court held that there had been no due process violation and that the case gave rise to no equal protection concerns, observing that the biological father "has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." *Id*. at 255-56.

Finally, the trial court considered *Stanley v. Illinois*, 405 US 645, 92 S Ct 1208, 31 L Ed 2d 551 (1972). In that case, the State of Illinois had a statutory scheme under which children of unwed mothers became wards of the state if their mother died. In that case, the biological parents of three children had lived together intermittently for 18 years but were not married. *Id.* at 646. The mother died, and the children became wards of the state and were placed with court-appointed guardians. *Id.* The biological father appealed that decision and claimed that, because he had not been shown to be an unfit parent, he had been denied equal protection of the laws. *Id.* That was so, he contended, because, under Illinois law, married fathers and unwed mothers could not be deprived of their children without a similar showing. *Id.* The Court held that the father was entitled to a hearing on his fitness before the children could be removed from his care. *Id.* at 658.

Schnitzer argues that the foregoing Supreme Court decisions do not support the trial court's conclusion that Sause has a constitutionally protected parental right. As he characterizes the circumstances here, a "gamete donor's inchoate plan for a future 'maternal role,' even if the future father has shown support for it, cannot establish legal parenthood. Sause's expectations, however sincere and strongly held, are not sufficient." Schnitzer asserts that *Stanley* is particularly unhelpful because the existence of a parental right was not at issue in that case. And, to the extent that *Lehr* and *Quilloin*, both of which involved natural parents, are applicable to this case involving gamete donation and *in vitro* fertilization, Schnitzer contends that those cases support reversal. In his view, each of those cases conditioned its recognition of a protected parental right on a far more substantial showing than Sause has made here. *Lehr*, Schnitzer observes, would require a custodial, personal, or financial relationship of some duration, whereas *Quilloin* would require daily contribution to the child's education, protection, and care. Schnitzer contends that the showing that Sause has made as to S in this case falls far short of the showings that the Supreme Court deemed sufficient to establish a protected parental right in its own decisions.

Sause responds that, to the extent that we reject her argument that she was not required to show more than a biological connection to be entitled to parental rights, she has made a sufficient showing here. As we will explain, we agree with Schnitzer that *Lehr* and *Quilloin* provide substantial guidance as to what kinds of evidence can give rise to protected parental rights premised on a biological connection, and that Sause has not made the requisite showing here.

Before we apply those decisions of the United States Supreme Court, we note that Schnitzer also contends that the trial court misapplied our decision in *Wooden* in concluding that Sause had made a sufficient showing to establish parental rights as to S. We agree. In *Wooden*, we recognized that the father had developed "a substantial father-son relationship" and concluded that he had parental rights that had to be given significant weight in determining whether he should have custody. 184 Or App at 551. We described that relationship as follows:

> "[W]e do not underestimate the importance of the fact that, before mother's death, father visited only sporadically and fell behind in his child support payments. But we also note, in mitigation, that father did not desert mother and child, she chose to leave him; that he did maintain some contact and paid two-thirds of his support obligation; that, for part of child's life, he and child were separated by geography, with child in Seattle (father does not drive); that father's pastor advised him that his mental health would be best served by limiting or eliminating contact with mother and child; and that, for the year immediately before mother's death, father stopped all visitation because mother and her violence-prone husband told him to stay away.

> "Most significantly, we note father's conduct after mother's murder. He came forward to discuss child's future within 48 hours of learning that mother and her husband were dead. Since that time, he has paid all support obligations, even after learning from grandparents that they did not want or need payment. He has also maintained a near-perfect record of regular visitation, despite the fact that he had to take public transportation from Vancouver, Washington, to grandparents' home in Washington County.

> *** [H]e has taken every possible step to make himself an important presence in child's life."

184 Or App at 550.

Sause emphasizes *dicta* in *Wooden* to suggest that our opinion in that case supports her position. Specifically, on our way to concluding that the father had a protected parental right that he could assert in custody proceedings, we stated that the father's biological connection to the child was not itself a sufficient basis for the father to "avail himself of the 'supervening right' to a privileged position in the decision whether to grant custody" of the child to the grandparents. *Id.* at 549. We went on to state that

> "[t]hat conclusion, however, does not end our inquiry; as we noted in *McIntyre*, *Lehr* teaches that, while a biological father does not have parental right automatically and for that reason only, even a relatively uninvolved parent may, by virtue of his conduct, avoid losing them. *Lehr* speaks of the father's opportunity to 'develop a relationship with his offspring' ***. We must now determine whether father has done so.

> "We conclude that he has. *There is some force to the argument that he has done so merely by virtue of acknowledging paternity; that act alone distinguishes him from the putative parents in* Lehr, Quilloin, McIntyre, *and other cases demonstrating the insufficiency of a merely biological connection.* We need not decide that question here, however, because father has done much more."

*Id.* at 549-50 (citation omitted; emphasis added). Sause emphasizes our statement that the act of acknowledging paternity might be enough to establish parental rights. However, as we expressly recognized in *Wooden*, we had no occasion in that case to decide whether that act would be sufficient to confer a parental right, because the father had "done much more." *Id.* Moreover, other than purporting to distinguish certain precedents, we provided no reasoning for our observation that there was "some force to the argument that he has done so merely by virtue of acknowledging paternity," *id.* at 550, and it is not otherwise evident why we said it. That is, in each of the cases that we purported to distinguish, the putative fathers were actively seeking to

establish rights and obligations as *fathers*; it is not evident
how the fact that the father had formally acknowledged
paternity in *Wooden* might somehow be viewed as having
taken a more substantial step towards accepting responsi-
bility for a child than did the putative fathers in those other
cases. As a result, we do not view that statement in *Wooden*
as having any bearing here. Moreover, as we explain below,
Sause's showing in this case falls far below that of the father
in *Wooden*; thus, to the extent *Wooden* applies here at all, it
supports Schnitzer's position, not Sause's, as the trial court
understood.

　　　Returning to the federal case law, we now consider
whether Sause made an adequate showing that she had
"grasp[ed] the opportunity" presented to her by her biolog-
ical connection to S. *See Lehr*, 463 US at 261-62 (explain-
ing that a biological connection to a child creates an oppor-
tunity to develop a relationship with a child and holding
that a father acquires a right to a parental relationship
"[i]f he grasps that opportunity and accepts some mea-
sure of responsibility for the child's future"). In applying
that case law here, we assume without needing to decide
that Sause's claim to a parental relationship under that
case law is no less than that of a person who conceives a
child through sexual intercourse; that is, for purposes of
discussion, we reject Schnitzer's argument to the contrary.
Further, we conclude, based upon that case law, that the
appropriate time reference for examining Sause's efforts
to grasp the opportunities of parenthood is the time *before*
she pursued court action, as any legal or equitable claim
that she might have had would necessarily have been pre-
mised on rights that she had at the time of her filing. *See
id*. at 262 (considering biological father's relationship with
and efforts in regard to child before seeking to establish
legal ties); *Quilloin*, 434 US at 255-56 (considering biolog-
ical father's efforts before contesting adoption and observ-
ing that he "has never exercised actual or legal custody
over his child, and thus has never shouldered any signif-
icant responsibility with respect to the daily supervision,
education, protection, or care of the child"); *cf. McIntyre*,
98 Or App at 472 (conditioning biological father's claim on
substantiation of assertion that he had donated sperm in

reliance on mother's agreement that he would enjoy parental rights).

Sause asserts that there is no bright-line test for determining whether the biological parent of a newborn child has adequately "grasped the opportunity" to develop a relationship with that child. In support of the conclusion that she has done so here, she contends that she has shown more than the mere filing of a legal claim after S was born. She asserts that she was not just a "gamete donor," as Schnitzer would characterize her; rather, she emphasizes, she and Schnitzer were in a romantic relationship and, as Sause now recounts, the two "agreed to have a child together" using IVF and a gestational carrier.[15] She acknowledges that she understood that Schnitzer was to be the custodial parent and would make all significant parental decisions in S's life, but she asserts a further understanding that she would be identified as S's mother on his birth certificate and would "always play some role in the child's life." Sause also points to the fact that she exchanged numerous emails and texts with Schnitzer during the pregnancy in which the two of them discussed "her role in the life of her son" and that she ultimately entered into the Agreement, which she understood to guarantee her right to participate in S's life.

Additionally, Sause describes her efforts in having her eggs retrieved under anesthesia, her involvement with the creation of embryos, and her emotional attachment with the first gestational carrier, who did not have a successful pregnancy. Finally, Sause notes that she received regular updates as the ultimately successful pregnancy progressed, and she was at the hospital and held S shortly after his birth.

We agree with Sause that there is no bright-line test for when a biological parent has made the showing necessary to acquire a constitutionally protected parental right. However, we conclude that, to the extent that the efforts and understandings that Sause relies on are relevant and supported by the record, they nevertheless fall short of

---

[15] The trial court's findings refer to Sause as donating eggs and male embryos and gifting eggs; the trial court did not make a finding that Sause and Schnitzer "agreed to have a child together."

showing that she "grasp[ed] [the] opportunity [to develop a
parent-child relationship] and accept[ed] some measure of
responsibility for the child's future." *Lehr*, 463 US at 262. We
recognize that Sause sought to assert her parental rights
in court fairly shortly after S was born and that, given
Schnitzer's decision to prevent Sause from having further
contact with S, there probably was not much more that she
could have done at that point to further establish a rela-
tionship. Nonetheless, by that time there had been sufficient
opportunity for Sause to demonstrate a "full commitment to
the responsibilities of parenthood." *Id*. at 261. She did not do
so.

First, although the record reflects that Sause and
Schnitzer were in a romantic relationship for a time, it does
not reflect—and the trial court did not find—that the deci-
sion to have S grew out of that relationship or that Sause
and Schnitzer made a joint decision to have a child. Rather,
as the court found, Schnitzer came into the relationship
already engaged in efforts to add a son to his family. True,
Schnitzer hoped that Sause and he would marry and that
they would form a family including S; that, however, does
not reflect in any way on *Sause's* own commitment to parent
S.

Similarly, even assuming that Sause and Schnitzer
had at some point discussed having Sause's name on S's
birth certificate,[16] she does not contend that, in seeking to
be identified as S's mother in that way, Sause was some-
how seeking to accept responsibility for the nurturing and
upkeep of S as her child. Indeed, although Sause now points
to the parties' written contract as reflecting her intent to
play a parental role in S's life, that document expressly
*disavowed* any financial or other responsibility for S. 312
Or App at 79 (quoting release language in the Agreement).
Furthermore, Sause does not rely on the Agreement as *cre-
ating* parental rights for her; her argument on appeal has
been that it did not serve to *terminate* any parental rights

---

[16] It is not clear whether the trial court made any finding on this issue. It
described Sause's testimony that she would never have thought to ask about the
birth certificate, but it also quoted a text message from Sause to her sister, in
which Sause says that she told Schnitzer she would sign "open adoption type
documents as long as my names [*sic*] on birth cert."

that she otherwise had in S. Thus, whatever unilateral significance the Agreement may have had for Sause, it cannot support her contention that, before filing a claim asserting parental rights, she had demonstrated any "commitment to the responsibilities of parenthood," much less a "full commitment." *See Lehr*, 463 US at 261.

That leaves, in support of Sause's argument that she has established a right to parent S, her argument that she underwent a serious procedure to have her eggs retrieved and that she and Schnitzer had repeatedly discussed that she would play a maternal role in S's life. Given the trial court's finding that Sause chose to have her eggs retrieved for her own, fertility-preservation purposes—in other words, *not* for the purpose of sharing eggs with Schnitzer or having a child with him—we can attach no legal significance to any physical, financial, or emotional challenges that that process may have caused her. That is, nothing about Sause's submission to that procedure demonstrates a commitment to be responsible for any resulting children. Moreover, it cannot serve as a basis to show that Schnitzer promised her a parental role in S's life in exchange. *See McIntyre*, 98 Or App at 470 (recognizing that commitment by other parent in exchange for sperm donation might be basis for asserting a claim to parental rights).

Likewise, the parties' discussion of a "maternal role" for S is insufficient to establish a constitutionally protected parental right. We acknowledge that, in some instances, representations by the other parent that a biological donor will have parenting rights may give rise to such rights. *See id*. Here, however, the parties' seemingly vague discussions about a "maternal role" for Sause neither reflected a commitment on her part to the responsibilities, *see Lehr*, 463 US 261, nor, given their timing, appear to have served as an incentive for Sause to donate her eggs in the first place. Accordingly, they, too, fail to demonstrate Sause's right to parent S.[17]

---

[17] The dissent points to additional facts that, in the dissent's view, further evidence Sause's plans to parent S and her reliance on Schnitzer's similar understanding to that effect. *See* 312 Or App at 113 (Kamins, J., dissenting) (discussing evidence "sufficient to show that Schnitzer and Sause—two people in a romantic relationship—intended that Sause would play a maternal role in S's

Because we conclude that Sause has not established a right to parent S, the trial court erred in denying Schnitzer's motion to dismiss Sause's petition and Schnitzer's request for a declaration that he is S's sole parent. Moreover, because Sause has not established that she ever had a right to parent S, we need not consider whether she waived that right through the parties' written agreement, as Schnitzer contends in his third and fifth assignments of error. We therefore reverse the trial court's decision and remand for entry of a judgment declaring that Schnitzer is the sole parent of S and declaring that Sause is not the legal mother of S. *See Beldt v. Leise*, 185 Or App 572, 576, 60 P3d 1119 (2003) (party is "entitled to a declaration of its rights, even if that declaration is directly contrary to what it believes its rights to be").

Reversed and remanded for entry of judgment declaring the rights of the parties.

**MOONEY, J.,** specially concurring.

S had two legal parents when he was born: Cassandra Gibeaut because she gave birth to S, ORS 432.088(8),[1] and Charles Gibeaut because he was Cassandra's husband when S was born, ORS 109.070(1)(a), and because he consented

---

life"). Although some of that evidence clearly reflected Schnitzer's desire to marry Sause and raise S together, nothing about those circumstances reflects a promise that Sause would be assured a maternal role even if the relationship failed or Sause's reliance on such expectations in donating her eggs to Schnitzer.

[1] ORS 432.088(8) provides:

"For purposes of making a report of live birth and live birth registration, the woman who gives live birth is the birth mother. If a court of competent jurisdiction determines that a woman other than the birth mother is the biological or genetic mother, the court may order the state registrar to amend the record of live birth. The record of live birth shall then be placed under seal."

That is consistent with the longstanding presumption that the woman giving birth to the child "has a right to the custody and control of [the child] as against the putative father, and is bound to maintain [the child] *as* [*the child's*] *natural guardian*." James Kent, 2 *Commentaries on American Law* 215 (8th ed 1854) (emphasis added). Oregon has long recognized the common-law rule. *See Nine v. Starr*, 8 Or 49, 50 (1879) (common-law-putative father of illegitimate child has no support responsibility; *birth mother* is legally responsible for child's support and upbringing). The language in ORS 109.065(2) was added by the legislature in 2017, Or Laws 2017, ch 651, § 2, and it codifies the common law:

"A person is the mother of a child to whom the person gives birth."

to the performance of the assisted reproduction technology (ART) procedure that resulted in his wife giving birth to S, ORS 109.243. The Gibeauts then stipulated to entry of a "General Declaratory Judgment of Parentage" in Multnomah County Circuit Case No. 15DR19365 that "ordered, declared and adjudged" Jordan Schnitzer to be the "legal parent of [S]." Sause does not dispute the authority of the court to enter that judgment under Oregon's Declaratory Judgment Act, ORS 28.010 to 28.160, nor does she dispute—or challenge—that Schnitzer is S's legal parent. Because the majority remands these consolidated cases for entry of judgments declaring Jordan Schnitzer to be S's legal parent, consistent with the judgment of parentage in Multnomah County Circuit Court Case No. 15DR19365, I concur. I write separately because I would use a different, shorter, path to get there.

The Gibeauts did not conceive S through sexual intercourse. In fact, they did not conceive him at all. Conception—fertilization of a female reproductive cell, also known as a "gamete" (Cory Sause's ovum or egg) with a male reproductive cell, also known as a "gamete" (Jordan Schnitzer's sperm or spermatozoon)—occurred in a laboratory and resulted in an embryo with a fully fused set of chromosomes (23 pairs, totaling 46) that was later introduced into Cassandra Gibeaut's uterus with the hope of implantation. Implantation was successful and Cassandra Gibeaut delivered S some months later.

When the trial court entered its judgment establishing Sause's parentage by declaring her to be S's "legal mother," the judgment of parentage in Multnomah County Circuit Court Case No. 15DR19365 had been entered and, importantly, Senate Bill (SB) 512 (2017) had become the law in Oregon. Of particular relevance here, SB 512 amended ORS 109.065 to add subsection (2), which provides that "[a] person is the mother of a child to whom the person gives birth." ORS 109.065(2). SB 512 also amended ORS 109.239, which provides:

"(1)  As used in ORS 109.239 to 109.247, 'assisted reproduction' means a method of causing pregnancy other

than sexual intercourse. 'Assisted reproduction' includes, but is not limited to:

"(a)   Artificial insemination as defined in ORS 677.355;

"(b)   Donation of eggs;

"(c)   Donation of embryos;

"(d)   In vitro fertilization and transfer of embryos; or

"(e)   Intracytoplasmic sperm injection.

"(2)   If the donor of gametes used in assisted reproduction is not the mother's spouse:

"(a)   The donor shall have no right, obligation or interest with respect to any child conceived as a result of the assisted reproduction; and

"(b)   Any child conceived as a result of the assisted reproduction shall have no right, obligation or interest with respect to the donor."

By its express terms, the legislature directed that SB 512 apply "to establishments *** of parentage *** made *** on or after the effective date of this 2017 Act." Or Laws 2017, ch 651, § 54. The effective date of the Act was January 1, 2018. *See* ORS 171.022 (unless otherwise provided, a statute takes effect on January 1 of the year following its passage). The judgment establishing parentage in Case No. 16DR18690 was entered on January 18, 2018, and the judgment establishing parentage in Case No. 16DR19349 was entered on January 24, 2018. At the time each judgment was entered, Sause had no parental rights with respect to S under SB 512 section 4 (codified at ORS 109.239(2)(a)), because S was a child conceived as a result of an ART procedure using eggs Sause had donated[2] for that purpose. The judgment establishing parentage in each case was, therefore, unlawful.

It is clear that the trial court was aware that SB 512 would soon take effect because it commented that it thought the new law was "interesting" and that SB 512

---

[2] The trial court found, among other things, that Sause had "donated" her eggs and signed paperwork "to transfer" those eggs to Schnitzer. The evidence in the record supports those findings.

reflected "where the future is headed." It nevertheless issued a ruling that is inconsistent with SB 512. To be sure, the court signed its written findings and conclusions of law on December 6, 2017, 26 days before SB 512 took effect. But, as it happened, the judgments, which incorporated the court's rulings, were not entered into the court's register until after SB 512 became effective. Surely it was not surprising to the lawyers or to the court that the date of signing and the date of entry occurred on different dates. Had it been surprising, or even unintended, there would surely have been a judgment entered *nunc pro tunc* to December 6, 2017. But that did not happen.

Sause argues that we should turn a blind eye to the date that the judgment was entered because the court issued its written findings in December 2017, and its ruling should be reviewed according to the law as it existed at that time. Schnitzer correctly argues that, until entered, the judgments establishing parentage were not final, appealable, or enforceable. ORS 18.082(1). The majority largely ignores SB 512, reasoning that the parties "understood" that the new law would not apply. 312 Or App at 86 n 9. And the dissent ignores SB 512 altogether. But Schnitzer provided the trial court with a copy of SB 512, and he advised the court of the approaching effective date. The issue was raised and discussed.

And, even if Schnitzer had not raised or adequately preserved the issue below, we cannot ignore it on appeal because we cannot conduct proper legal review without determining what law applies to the judgments. Whether the trial court correctly concluded that Sause is S's "legal mother" requires us to determine whether the amendments to Oregon's paternity and artificial insemination statutes made by SB 512 were in effect and, thus, applicable to the judgments from which this appeal was taken. And that presents a question of statutory interpretation. *See Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) (where the Supreme Court held in an analogous situation that, "[i]n order to decide whether the Court of Appeals erred in concluding that all plaintiff's claims were time barred, this court must determine, as one part of that inquiry, at what point the action is deemed to have been commenced. ORS

12.020 governs the commencement of an action for purposes of statutes of limitations. Therefore, the question is one of statutory interpretation. In construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties."). *See also Miller v. Water Wonderland Improvement District*, 326 Or 306, 309 n 3 (1998) (observing that "the parties may not prevent a court from noticing and invoking an applicable statute by relying only on other sources of law"). The timing of entry of judgment is not a mere technicality—it determines when the judgment is final and enforceable. ORS 18.082(1);[3] *see also Patrick v. Otteman*, 158 Or App 175, 183, 974 P2d 217, *rev den*, 328 Or 594 (1999) (a judgment is ineffective until it is entered in the court register). SB 512 is clear with respect to its effective date. And, here, the judgments establishing parentage were entered after that effective date. SB 512 applies.

SB 512 was not a surprise. The bill itself modernized Oregon's outdated paternity and artificial insemination statutes, making them inclusive and gender neutral. There was no testimony in opposition to the bill. It easily passed, and its effective date was known. SB 512 is clearly written. It treats male and female gamete donors the same with respect to children born using donated reproductive cells. Moreover, SB 512 accomplishes by its express terms what Oregon's Equal Rights Amendment, Or Const, Art I, § 46, already required—equal treatment of male and female gamete donors under the law. In other words, SB 512 made clear what the Oregon Constitution already required in the context of ART—that ORS 109.239 be applied to afford the

---

[3] ORS 18.082(1) provides:

"Upon entry of a judgment, the judgment:

"(a) Becomes the exclusive statement of the court's decision in the case and governs the rights and obligations of the parties that are subject to the judgment;

"(b) May be enforced in the manner provided by law;

"(c) May be appealed in the manner provided by law;

"(d) Acts as official notice of the court's decision; and

"(e) May be set aside or modified only by the court rendering the judgment or by another court or tribunal with the same or greater authority than the court rendering the judgment."

same rights to a man who is a child's legal parent against parental claims of a female gamete donor as it affords to a woman who is a child's legal parent against parental claims of a male gamete donor.

I agree with the trial court, the majority, and the dissent when they conclude that genetics alone do not confer parental rights. I do not agree that a man or woman who donates reproductive cells for use in ART procedures has the same right to develop a parental relationship with any child born using one of those cells as a man or woman who provides reproductive cells through sexual intercourse would have. And, more importantly, the legislature has expressed its intent through Oregon's parentage and ART laws that those two situations are different as a matter of law.

The relationships that the law defines for those who procreate through sexual intercourse—the vast majority of people using the "old-fashioned" method of family planning—has developed over the centuries through case law and statutory law generally tracking societal values and norms. Those using ART procedures to create children—a clear minority of the population using the "clinical" method of family planning—generally do so because they are otherwise unable to procreate through sexual intercourse for reasons ranging from infertility in an opposite sex partnership or marriage to biologic impossibility in a same-sex partnership or marriage to a person desiring to parent without a partner or spouse. Thoughtful planning is key and the laws governing ART protect those who create their families using ART from claims of third parties who are otherwise strangers to the family. It does so for much the same reason the law presumes that a child born to a married woman is also the child of her spouse—to preserve intact families. I respectfully suggest that the reason existing law provides a rebuttable presumption when a child is conceived through sexual intercourse is that the intent of the parties is not always clear because sexual intercourse serves purposes in addition to procreation. The intent of the parties using ART procedures is much clearer. ORS 109.239, as amended by SB 512 in 2017, does not "elevate the rights of healthy cisgender heterosexuals over marginalized groups" as suggested by the dissent. 312 Or App at 115 (Kamins, J., dissenting). The

statute protects the ability to thoughtfully engage in family planning for those most likely to use ART procedures—members of the LGBTQ+[4] communities and those otherwise struggling with fertility challenges.

Most of the cases on which my colleagues rely for the "right to grasp" for parental rights do not concern ART. They concern children conceived through sexual intercourse, and they are distinguishable for that reason. And, unlike the sperm donor in *McIntyre v. Crouch*, 98 Or App 462, 780 P2d 239, *rev den*, 308 Or 593 (1989), *cert den*, 495 US 905 (1990), Sause does not expressly claim that she donated her eggs in consideration of Schnitzer's promise to allow her to have parental rights with respect to any offspring born using her eggs. Moreover, in my view, the plurality in *McIntyre* was incorrect when it concluded that the prior version of ORS 109.239 was not a bar to the sperm donor's claim for parentage. The dissenting judge in *McIntyre* would correctly have applied ORS 109.239 as an absolute bar to the sperm donor's claim of parentage without violating any constitutional due process rights. In that dissenting opinion, Presiding Judge Richardson explained that the prior version of ORS 109.239 at issue in *McIntyre* was a "substantive regulation in which the governmental interest is great. Its effect is not limited to parental rights and obligations. \* \* \* The statutes contemplate that the ultimate relationship, or absence of one, must be defined before the child is conceived in order to facilitate informed decisions about whether to donate and to conceive." 98 Or App at 477 (Richardson, P. J., dissenting). That is most certainly as true today of ORS 109.239, which now includes ART procedures in addition to artificial insemination, as it was in 1989 when ORS 109.239 included only artificial insemination. I would adopt the approach of the dissenting opinion in *McIntyre* to conclude that Sause has no parental rights as a gamete donor.

It is worth noting that Sause signed a contract relinquishing any claim she might arguably have in "the embryos and offspring that might result from the use of

---

[4] The acronym stands for Lesbian, Gay, Bisexual, Transgender, Queer, and other gender identities and sexual orientations not specifically covered by the first five initials.

[her] eggs" for *in vitro* fertilization. That she and Schnitzer had conversations that were inconsistent with that agreement has no bearing on the outcome of this case, in part, because the parol evidence rule, ORS 41.740, would prevent consideration of some of those conversations, *Lyons v. Beeman*, 311 Or App 560, 569-70, 494 P3d 358 (2021), and, more importantly, because ORS 109.239 bars Sause's claim of parentage *ab initio*. If a "genetic link" somehow trumps Sause's contractual agreement and provides her with a constitutional "right to grasp" for a chance to be designated the child's legal parent, it is difficult to imagine why anyone thoughtfully planning a family would do so using donated reproductive cells. Of course, SB 512 is now clearly in place, and it is more than just interesting. It is the law and it does not permit such an unwieldy result.

This case is not nearly as complex as the factual context presented by the parties would suggest. Schnitzer and Sause were romantically involved, and they engaged in a sexually intimate relationship. They also entered into a contract by which Sause gave up any parental rights she might arguably have with respect to any male child born using embryos created through the clinical fusion of her reproductive cells with those of Schnitzer. Setting aside the curiosity of why one would condition their intent to assert parental rights based solely on the gender assigned to a child at birth, or why one might wish to be known as a mother but have no corresponding legal obligation to the child, and ignoring the sexual relationship that the parties apparently had but that did not result in the conception of a child, Schnitzer and Sause were simply gamete donors. In fact, there is nothing terribly complex about that. Neither had any parental rights when S was born. Schnitzer's status as S's legal parent came from his agreement with the Gibeauts, not from his genetic link to S. He is a man who is also S's legal parent. ORS 109.239 bars any claim by Sause as a gamete donor for parental rights.

I agree that the case should be remanded for entry of a judgment declaring that Schnitzer is S's legal parent and that Sause is not S's legal parent. Accordingly, I concur in the result reached by the majority, but not in its reasoning.

**KAMINS, J.,** dissenting.

The constitutional interest of parents in the care of their children "is perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 US 57, 65, 120 S Ct 2054, 147 L Ed 2d 49 (2000). I respectfully dissent from the majority opinion because, in my view, Sause made a sufficient showing that she possesses a fundamental liberty interest in the parenting of S, the child created with her and her then-romantic partner's genetic material. Sause was assured a role in S's life, and as soon as that role was put in jeopardy, Sause took swift action to protect her rights.

As a preliminary matter, I agree with the majority that, under the Due Process Clause of the federal constitution, Sause's "mere biological connection to S does not confer parental rights," 312 Or App at 93, but rather "Sause's biological relationship to S provided a link that, under certain circumstances could form a basis for acquiring a legal, parental relationship," *id.* at 85. That link, as described by the Supreme Court, offers the genetic parent "an opportunity that no other [person] possesses to develop a relationship with his offspring." *Lehr v. Robertson*, 463 US 248, 262, 103 S Ct 2985, 77 L Ed 2d 614 (1983). If a genetic parent "grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." *Id*.

I part ways with the majority in the conclusion that Sause did not grasp those rights. The majority asserts that, because Sause neither demonstrated a "full commitment" to parenting S nor established that her donation of eggs was motivated by reliance on an agreement that she would be S's legal mother, she did not establish a constitutionally protected parental right. 312 Or App at 102-03 (citing *Lehr*, 463 US at 261). I disagree with both points.

First, the interactions between Sause and Schnitzer are critical to determining the amount of grasping that would have been required to secure parental rights. Had the two agreed that Sause would be S's mother, but also agreed that Sause would be stationed on a nine-month-long research mission in Antarctica during the surrogacy, one

would not anticipate Sause would do much grasping during that time. And here, the conversations that the majority characterizes as "seemingly vague discussions," *id.* at 103, were, as the trial court noted (after a nine-day bench trial), sufficient to show that Schnitzer and Sause—two people in a romantic relationship—intended that Sause would play a maternal role in S's life. Sause "mad[e] plans for a nursery in her home in anticipation of playing a visiting parent role" and texted Schnitzer that she had told the painter that her "hearts [*sic*] set on boys" when the painter commented on her choice of blue walls for the nursery. Schnitzer asked Sause if she was "going to be ready for a baby" when she was babysitting a friend's child, and he told her "yo[u] are always in denial about your maternal instincts…this is our baby" when Sause expressed surprise that she "[could]n't stop thinking about cribs."

In addition to communicating his hope and plan to Sause that she would play a maternal role with S, Schnitzer communicated that plan to Sause's parents as well, texting them a picture of an ultrasound image of S and calling S "Your grandson!" He further shared that he had told the surrogate about "the role [Schnitzer] hoped that [Sause's parents] will play" in S's life. Schnitzer gave Sause's parents the "blow-by-blow" of the pregnancy, invited Sause and her parents to an ultrasound appointment, and, on the day of S's birth, Schnitzer "sent multiple photos from the hospital" to Sause and her parents. They all were admitted to the birthing room and held S on the day of his birth. Up until Schnitzer's unilateral refusal to allow Sause to see S, Sause, like the mother stationed in Antarctica, had no reason to think that she needed to take any action to acquire parental rights.

Second, I disagree with the majority's conclusion that Sause did not rely on that shared intent when she donated her eggs. We have recognized that it would violate the Due Process Clause to deny parental rights to a person donating gametes who has done so in reliance on an understanding that he or she would have the rights and responsibilities of parenthood. *McIntyre v. Crouch*, 98 Or App 462, 472, 780 P2d 239, *rev den*, 308 Or 593 (1989), *cert den*, 495 US 905 (1990). Like the petitioner in *McIntyre*,

Sause trusted the conversations that she had with the other genetic parent as part of the decision to donate her eggs.[1] Here, she trusted Schnitzer's repeated assertions that she would play a maternal role in S's life. Moreover, S was being carried by a surrogate, limiting any practical role for Sause in the pregnancy. Nevertheless, Sause did execute an agreement with Schnitzer that (albeit far from a model of clarity) clearly deviated from an anonymous donor agreement in a critical respect: it contemplated a role for Sause in S's life. In light of the nature of the pregnancy and the understanding between the couple that Sause's role would be limited, it is difficult to imagine what additional steps Sause should have or even could have taken prior to S's birth. And when the couple's mutual understanding changed—immediately following the birth—Sause acted promptly by attempting to grasp at the opportunity for parental rights through retaining counsel and initiating legal action.

The majority concludes that Sause's action in filing the suit does not evince her efforts to grasp at parental rights because our review is limited to actions that occurred before she filed suit. 312 Or App at 100. I disagree on that point as well: in contrast to the case law that the majority relies on for that assertion, here, filing suit to establish her parental rights was one of the first actions available to Sause. Less than three months after S's birth, Sause moved to intervene in the declaratory judgment of parentage action that Schnitzer filed immediately after S's birth, and, soon after that intervention failed, she filed the suit that is the subject of this appeal. *Cf. Lehr*, 463 US 248 (biological father filed suit to block adoption of child by mother's husband when child was over two years old); *Quilloin v. Walcott*, 434 US 246, 98 S Ct 549, 54 L Ed 2d 511 (1978) (biological father filed suit to block adoption of child by mother's husband when child was 11 years old).

What seems to animate a contrary result in this case is that Sause did not seek a "full commitment" to the

---

[1] Although, as the majority correctly points out, the trial court found that Sause did not have her eggs harvested for purposes of providing them to Schnitzer, 312 Or App at 103, the trial court also credited her testimony that she donated her eggs to Schnitzer based on their shared understanding that she would be "actively involved" in S's life.

role of parent because she sought a more limited role in S's life. 312 Or App at 101-03. We have not had cause to determine whether a person must grasp for the *full* rights and responsibilities of parenthood in order to be able to secure those rights. I question, however, whether it is our role to determine who has a constitutional right to parent based on a judicial evaluation of the type of parent they want to be. As the *Lehr* Court recognized, "[t]he intangible fibers that connect parent and child have infinite variety." 463 US at 256. That variety has only multiplied as parents have woven those fibers in ever-increasing family arrangements in the forty years since *Lehr* was decided. Whether the way someone chooses to make a family creates a constitutional right cannot be as simple as whether someone intends to be a full-time parent or not a parent at all.

The inquiry instead hinges on whether an individual who provided genetic material by whatever means waived their constitutional rights, not whether those rights existed in the first place. Genetic parents of all types have constitutionally protected rights, and there is no constitutional language or case law that supports the concurrence's assertion that the constitution provides different levels of protection for people using ART and people using sexual reproduction. 312 Or App at 109-10 (Mooney, J., specially concurring). *See e.g.*, *McIntyre*, 98 Or App at 472 ("The Due Process Clause can afford no different protection to petitioner as the biological father because the child was conceived by artificial insemination rather than by sexual intercourse [if he provided his genetic material for the purpose of creating offspring together with the other parent]."). Affording sexual intercourse— often engaged in not for the purpose of reproduction— greater constitutional protection than the use of ART would inevitably elevate the rights of healthy cisgender heterosexuals over marginalized groups and people struggling to conceive.

As we have previously stated, a well drafted donor agreement protects the intended parents of a child because it "expressly and effectively waive[s] any entitlement to assert parental rights" on the part of the donor. *Leckie and Voorhies*, 128 Or App 289, 293, 875 P2d 521 (1994). And that waiver, not the method by which a person's gametes are

used in the creation of a child, is the mechanism that ORS 109.239 enforces. If, as the concurrence appears to propose, the statute categorically removes protection for the parental relationship of individuals who conceive through ART by excluding them from the *Lehr* line of cases, it would not pass constitutional muster.[2]

Because the evidence reflects that Sause grasped at the opportunity to be S's mother, I respectfully dissent.

---

[2] Because I conclude that Sause established a constitutionally protected parental right, I would reach the issue of whether Sause waived that right by signing the Nudelman Agreement. As to that issue, I would affirm the trial court because that agreement does not reflect an unambiguous waiver of Sause's parental rights.